UNITED STATES BANKRUPTCY COURT
DISTRICT OF MARYLAND
(Baltimore Division)

IN RE:                                              *

THE INNOVATIVE TECHNOLOGIES             *    No.  25-18000
 GROUP & CO., LTD                                  Chapter 11
                                                    *
        Debtor
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

CONSENT MOTION FOR ENTRY OF ORDER AUTHORIZING DEBTOR'S USE OF CASH COLLATERAL AND GRANTING ADEQUATE PROTECTION TO SANDY SPRING BANK, A DIVISION OF ATLANTIC UNION BANK, PURSUANT TO 11 U.S.C. § 363

THE INNOVATIVE TECHNOLOGIES GROUP & CO., LTD, the debtor and debtor in possession (the "Debtor"), by JEFFREY M. ORENSTEIN, and WOLFF & ORENSTEIN, LLC, with the consent of Sandy Spring Bank, a division of Atlantic Union Bank ("Sandy Spring or the "Lender"), hereby moves the Court for entry of an Order (I) authorizing the sse of Sandy Spring's cash collateral, and (II) granting Sandy Spring adequate protection pursuant to 11 U.S.C. §§ 361 and 363.  In support thereof, the Debtor states as follows:

Jurisdiction

1.    This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue of this cases and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.    This is a core proceeding under 28 U.S.C. § 157.

Procedural History

3.    On August 29, 2025 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").

1

4. The Debtor continues to manage its affairs and property as a debtor-in-possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code.

5. The Debtor is a corporation that was formed under the laws of the State of Maryland on June 5, 1997.  Since that time, it has operated as a specialized manufacturer of process and quality control optical instruments serving the food and agriculture, packaging, and oil analysis industries.  Several of the instruments it manufactures are sole-source critical, highly technical, devices and components for companies that the Debtor has served for more than 25 years including any technological upgrades.  The Debtor has designed, invented and manufactured successful NIR products for companies over the course of its 28 years in business. Including selling the Unity Scientific Spectrastar product line to Westco Scientific in 2008 ($5,000,000 in sales per year at peak).  After the selling of the Unity Spectrastar product line in 2008, the debtor focused on continuing to provide the sole-source components, along with manufacturing consumables used in various analytical instruments and being a unique service provider for a variety instrumentation including support for instruments dating back to 1997.

6. Over the course of its existence, the Debtor and its employees have successfully patented at least five inventions that have been unique to the products provided to its customers.  One of those patents was assigned to, and remains property of, the Debtor.  The Debtor, its owners, and its employees are proud of the inventions and products the Debtor has produced and of the quality of service it has provided for nearly 30 years. With a customer base that depends on the Debtor to continue proper quality control for their products for the foreseeable future..

7. The Debtor created a new NIR product line.  Over the course of 4 years, and through partnerships with influential customers, it was able to fully launch and begin to market that product line in 2014.  The Debtor decided to market and sell this product line directly as its

own, unlike the typical OEM (Private Label) model, that it had used in the past.  The acceptance of this product led the Debtor to launch a wholly-owned sales and marketing subsidiary, Blue Sun Scientific, LLC ("Blue Sun") in 2018 that began to sell and market its own brand Phoenix NIR product line in late 2019.  The Phoenix line began to have good acceptance within the marketplace based upon some unique and innovative features that increased productivity in the food and agriculture markets.

8. With a dedicated team of ten employees, including 6 full-time employees with an average of twenty years of service to the Debtor, and operating out of its leased premises at Suite H, 8017 Dorsey Run Road, Jessup, Maryland 20794 (the "Property"), the Debtor has maintained a strong reputation for quality and reliability.  The Debtor's annual sales range between $1,200,000.00 and $1,800,000.00, and it has a consistent history of meeting its financial obligations, including payroll, taxes, and supplier payments to dozens of vendors, while delivering products on time to its customers.

9. On April 5, 2021, KPM Analytics North America Corporation ("KPM") a competitor of the Debtor, sued the Debtor, Blue Sun, and a number of individuals in the United States District Court for the District of Massachusetts (the "District Court"), asserting claims of trade secret misappropriation and tortious interference centered around the sales of the Phoenix NIR product line.  The initial basis of this lawsuit framed the accusations in a manner to imply that the technology for the Debtor's product was stolen from KPM through the hiring of new employees.  Initially a request for an injunction banning the creation of the instrumentation was requested and ultimately denied based on the fact that the Debtor was the original inventor of the technology in question.

10. The suit was filed in Massachusetts notwithstanding that neither the Debtor, Blue Sun, nor any of the other defendants were located in the Commonwealth of Massachusetts, and notwithstanding that there were no agreements between the parties or any of their predecessors that would have permitted jurisdiction to be proper in Massachusetts.  Respectfully, the District Court misapplied the law on jurisdiction and allowed the case to proceed in the District Court.

11. In August of 2021, a vague preliminary injunction was issued restricting the customer base that was eligible to purchase the NIR instrument from the Debtor.  As a result, there was confusion in the customer base that caused a pause in the growth of the product line.

12. The Debtor endured two years of rigorous legal battles requiring the Debtor to spend large amounts of money for legal fees.  Of equal importance, the litigation occupied significant portions of the time of leadership in engineering, accounting and sales arms of the Debtor.  Beyond creating a heavy debt burden, the distractions caused by the litigation led to less productivity and a reduction in sales growth.

13. On May 17, 2023, the jury in the District Court litigation found in favor of the Debtor on the trade secret and misappropriation claims, but against the Debtor for tortious interference.  The initial judgment amount allocated to the Debtor was $1,800,000.00.

14. KPM released press releases on social media that created doubts among some of the Debtor's repeat customers and partners about the Debtor's long-term viability.  This social media campaign created stagnation in sales for some of the Debtor's product lines.

15. As legal fees mounted and cash flow became an issue, many of the key vendors of the Debtor began to demand advance payment terms.  The vendors' demands significantly impacted the cash flow of the business. The Debtor made adjustments to the number of full-time employees that were on staff and began to use consultants less often.

16. In order to maintain operations, the Debtor utilized its lines of credit to continue to get the necessary parts to make instrumentation to meet the needs of its customers. These debts continued to pile up as sales decreased slightly in 2024.

17. In order to maintain its customer base, to overcome the negative publicity, and to attempt to attract new distribution channels, the Debtor chose not to increase the price points for their NIR product line. While the end user pricing remained flat, changes in the economy meant that prices for components were increasing in general. These increases were exacerbated by additional price increases due to the Debtor's inability to place larger bulk orders. These changes further negatively affected the Debtor's cash flow.

18. The Debtor was successful in brining on new countries for distribution in 2024 through its sales channel; however, there is typically an 18-month lead time for distributors to hit their full stride and, with this in mind, the Debtor does anticipate a significant growth in sales to begin until late 2025. This too will have a significant impact on the cash flow and stability of the Debtor.

19. On February 7, 2025, the District Court issued a final judgment in the litigation. The Judgment included interest and attorneys' fees and totaled more than $9,000,000.00. The District Court also provided injunctive relief which sets out 46 companies in the United States to whom the Debtor cannot sell its NIR product line to for a period of 10 years. While the injunction provides limitations on the Debtor's ability to market its products, the limitations in the injunction have served to clear up some of the market confusion and the Debtor believes that clarification will enable the Debtor to resume the growth trajectory that it saw pre-litigation.

20. On February 26, 2025, the Debtor and Blue Sun engaged the service of Smith Duggan Cornell & Gollub LLP ("Smith Duggan") to handle the appeal from the Judgments

entered against them in the District Court.  On March 4, 2025, Smith Duggan, on behalf of the Debtor and Blue Sun, noted an appeal from the Judgment entered by the District Court.  The appeal is currently pending in the United States Court of Appeals for the First Circuit and, based upon the schedule set by the First Circuit, the appellate Brief was due to be filed on or before September 3, 2025.  Based upon its research of the law and the facts, Smith Duggan is beyond optimistic that the Judgment will be reversed due to the District Court's clear lack of jurisdiction.  Smith Duggan also believes that there are significant errors relating to the substantive issues in the case.

21. With the appeal pending, on July 30, 2025, KPM enrolled the Judgment in the United States District Court for the District of Maryland and, without waiting the required 30 days to pursue collection action, sought and obtained Writs of Garnishment on the Debtor's bank accounts.

22. But for the collection action, with the completion of the litigation at the trial court level and the appellate Brief being readied for filing, the Debtor's management team believed it was prepared to focus its full attention on growing the Phoenix product line, thus enabling the Debtor to reach its full potential while continuing to provide the devices, components and services that have been unaffected by litigation.

23. Prior to the collection action by KPM, the Debtor was generally paying its debts as they came due and, but for what is believed to be an erroneous Judgment, the Debtor would have been able to operate without the intervention of this Court.

24. Nonetheless, the Debtor knew that the Judgment was going to impact its business and recognized it would likely need to file for protection under the Bankruptcy Code.

25. In advance of the enrollment of the Judgment in Maryland, the Debtor had consulted with W&O to evaluate its options. The Debtor retained W&O to engage in a detailed analysis of its finances to be able to assess what a Chapter 11 case might look like for the Debtor and might provide for creditors.

26. After the entry of the Judgment in Massachusetts, and knowing collection action was on the horizon, the Debtor decided that it likely would need to pursue relief under Chapter 11 in this Court in order to maximize its chances for long-term success.

27. The issuance of the Writs of Garnishment and the freezing of the Debtor's bank accounts resulting from the Writs sealed that decision.

### Secured Debt[1]

28. The Property where the Debtor operates is owned by ITPROP LLC ("ITPROP"), an entity that is an insider of the Debtor as that term is defined in the Bankruptcy Code.

29. As of the Petition Date, the Debtor was indebted to Sandy Spring in the total amount of $58,953.10 (the "Prepetition Indebtedness"). The Prepetition Indebtedness is evidenced by, inter alia: a Promissory Note dated March 15, 2011, executed and delivered by the Debtor to Sandy Spring, as amended from time to time including, without limitation, that certain Change In Terms Agreement dated October 30, 2019 (collectively, the "Note"); and a Business Loan Agreement dated October 30, 2019, by and between the Debtor and Sandy Spring (the "Loan Agreement"). In order to secure the Prepetition Indebtedness and the ITPROP Indebtedness (discussed below) due and owing to Sandy Spring, the Debtor previously granted a

---

[1] As discussed in more detail below, prior to and on the Petition Date, the Debtor's assets were encumbered by liens in favor of Sandy Spring and the United States Small Business Administration (the "SBA") with the SBA's liens being junior to Sandy Spring's liens. The SBA has already consented to the Debtor's use of its cash collateral.

security interest in the collateral described in the Note, including, but not limited to, all inventory, chattel paper, accounts, equipment, and general proceeds of the Debtor and the proceeds thereof and related thereto (the "Prepetition Collateral").  Sandy Spring's security interest in the Prepetition Collateral was properly perfected by virtue of a UCC-1 Financing Statement recorded with the Maryland State Department of Assessments and Taxation as filing number No. 0000000181416671 (the "Financing Statement"), as amended and continued from time to time.

30. The Prepetition Indebtedness is secured by a valid, perfected and enforceable lien on all of the Prepetition Collateral.  The Prepetition Indebtedness is also secured by an Indemnity Deed of Trust dated October 30, 2019, executed and delivered by non-debtors Robert R. Wilt and Cathy L. Wilt to the trustees named therein for the benefit of Sandy Spring (the "Deed of Trust").  The Note, the Loan Agreement, the Financing Statement, the Deed of Trust, and any and all other documents or instruments evidencing, securing or relating to the Prepetition Indebtedness are hereinafter collectively referred to as the "Loan Documents."

31. As of the Petition Date, non-Debtor ITPROP LLC ("ITPROP") was also indebted to Sandy Spring in the total amount of $220,492.18 (the "ITPROP Indebtedness").  The ITPROP Indebtedness is evidenced by, inter alia a Term Promissory Note dated March 15, 2011, executed and delivered by ITPROP to Sandy Spring in the principal amount of $356,500.00 (the "ITPROP Note") and a Guaranty Agreement dated March 15, 2011, executed and delivered by the Debtor to Sandy Spring (the "ITPROP Note Guaranty"), pursuant to which the Debtor unconditionally and irrevocably guaranteed the ITPROP Note and the ITPROP Indebtedness.  The Debtor also executed a Business Loan Security Agreement dated March 15, 2011, delivered to Sandy Spring (the "ITPROP Note Security Agreement"), pledging its assets as additional collateral for the

ITPROP Note.  The Financing Statement also secures the ITPROP Indebtedness.  The ITPROP Note, the ITPROP Note Guaranty, the ITPROP Note Security Agreement, the Financing Statement, and any and all other documents or instruments evidencing, securing or relating to the ITPROP Indebtedness are hereinafter collectively referred to as the "ITPROP Loan Documents."

32. The ITPROP Indebtedness is secured by a valid, perfected and enforceable lien on all of the Prepetition Collateral.  All of the Debtor's cash on hand and the proceeds generated by the Prepetition Collateral constitute the "cash collateral" of the Lender within the meaning of Bankruptcy Code Section 363(a).

33. The Debtor requires the use of Cash Collateral (defined below) and that the need for the use of the Cash Collateral is immediate and urgent as the ability to use the Cash Collateral is necessary, essential, and appropriate for the continued operation of the Debtor's business and the preservation of the value of its assets.

34. As a result of the Lender's liens upon, and security interests in, the Prepetition Collateral, and by virtue of Bankruptcy Code section 363(c)(2), the Debtor is unable to use the Cash Collateral without the consent of the Lender or the authorization of the Court after notice and a hearing.

35. The Debtor has requested that Sandy Spring consent to the use of Cash Collateral and, as evidenced by its execution of the proposed Consent Order filed with this Motion, Sandy Sporing has consented to the use of its Cash Collateral subject to the provision of adequate protection

36. The Debtor's monthly payments on the Prepetition Indebtedness were current though July of 2025, but the payment for the month of August 2025 of $533.29 was outstanding

and immediately due and owing on the Petition Date because the Debtor's account had been garnished by KPM.

## Relief Requested

37. During this case, the Debtor requires the use of Cash Collateral to meet its ordinary and necessary expenses. The Debtor's cash, accounts, receivables, and other rights to payment from third-parties are property of the Debtor's estate pursuant to Section 541 of the Bankruptcy Code, constitute cash collateral within the meaning of Section 363 of the Bankruptcy Code, and, as noted above, may be used by the Debtor only with the consent of the creditors that are secured by the cash collateral or upon an Order of the Bankruptcy Court.

38. In order for the Debtor to operate its business, meet its obligations and preserve its property, and in order to avoid irreparable harm to the bankruptcy estate, it is necessary for the Debtor to use proceeds of the Pre-Petition Collateral in which Sandy Spring and the SBA, as the Debtor's secured lenders, assert a security interest to pay its ordinary and necessary expenses, as set forth in the proposed budget attached hereto as Exhibit AA.

39. The Bankruptcy Code requires "adequate protection" of a lender's security interest in the Debtor's cash collateral. Adequate protection is afforded where operations continue at a break-even level or generate a profit and there is a strong likelihood of reorganization. *See, e.g., In re Xinde Int'l*, 13 B.R. 212 (Bankr. D. Mass. 1981); *In re Grant Broadcasting of Philadelphia, Inc.*, 71 B.R. 376 (Bankr. E.D. Pa. 1987).

40. As also noted above, and as evidenced by its budget, the Debtor's ordinary course operations are profitable. Indeed, but for the Judgment and resulting garnishment, there would have been no need for a reorganization and bankruptcy would not have been required. The Debtor seeks an Order that, inter alia:

a. Allows the Debtor, after the garnishments on its accounts are released, to use its accounts and rights to payment, in which Sandy Spring and the SBA assert a security interest, to pay those obligations set forth in the budget through the date of the Court's consideration of the Debtor's yet to be filed Plan of Reorganization;

b. Grants Sandy Spring and the SBA, pursuant to Sections 361 and 363(c)(2) of the Bankruptcy Code, adequate protection, retroactive to the Petition Date, of their respective interests in the Pre-Petition Collateral, including the cash collateral in an amount equal to the aggregate diminution in value, if any, of such interests from and after the Petition Date;

c. Grants Sandy Spring and the SBA a replacement lien on the same assets and in the same priority and extent of their Pre-Petition Collateral, if any; and

d. Requires the Debtor to provide monthly operating reports required by the Office of the United States Trustee (if required during the term of this cash collateral motion), as well as such other periodic financial information that Sandy Spring and the SBA may reasonably request of the Debtor (in addition to, and not in replacement of, those reporting obligations that the Debtor may have under the pre-Petition loan documents).

WHEREFORE, the Debtor respectfully request entry of an Order substantially similar to the attached proposed order:

a. Authorizing the Debtor, after the garnishments on its accounts are released, to use its accounts and right to payment in which Sandy Spring and the SBA assert a security;

b. Grants Sandy Spring and the SBA, pursuant to Sections 361 and 363(c)(2) of the Bankruptcy Code, adequate protection, retroactive to the Petition Date, of their respective interests in the Pre-Petition Collateral, including the cash collateral in an amount equal to the aggregate diminution in value, if any, of such interests from and after the Petition Date;

  c. Grants Sandy Spring and the SBA a replacement lien on the same assets and in the same priority and extent of their liens on the Pre-Petition Collateral;

  d. Requires the Debtor to provide monthly operating reports required by the Office of the United States Trustee (if required during the term of this cash collateral motion), as well as such other periodic financial information that Sandy Spring and the SBA may reasonably request of the Debtor (in addition to, and not in replacement of, those reporting obligations that the Debtor may have under the pre-Petition Loan Documents); and

  e. Granting such other and further relief as is just and equitable.

          Respectfully submitted,

         \s\ Jeffrey M. Orenstein
         JEFFREY M. ORENSTEIN (#07512)
         Wolff & Orenstein, LLC
         15245 Shady Grove Road, Suite 465
         Rockville, Maryland  20850
         (301) 250-7232
         jorenstein@wolawgroup.com

         Counsel for the Debtor

### CERTIFICATE OF SERVICE

I hereby certify that on the 5th day of September, 2025, a copy of the foregoing was served by electronic mail to:

Gerard R. Vetter, Esq.
United States Trustee
101 W. Lombard Street
Suite 2625
Baltimore, Maryland 21202
Gerrard.R.Vetter@usdoj.gov

Carol J. Hulme, Esq.
General Attorney
Baltimore/Richmond Offices
Office of General Counsel
U.S. Small Business Administration
Carol-Ann.Hulme@sba.gov

Michael D. Nord, Esq.
Gebhardt and Smith, LLP
One South Street, Suite 2200
Baltimore, Maryland 21202
mnord@gebsmith.com

      I hereby further certify that on the 5th day of September, 2025, a copy of the foregoing was served by first class mail, postage pre-paid, to:

Sandy Spring Bank
c/o Daniel J. Schrider, Resident Agent
17801 Georgia Avenue
Olney, MD 20832

Sandy Spring Bank
c/o Kimberly Sargent
Compliance and Government Reporting Specialist
17801 Georgia Avenue
Olney, MD  20832

Atlantic Union Bank
c/o CSC Lawyers Incorporating Service Company, Resident Agent
7 St. Paul Street
Suite 820
Baltimore, MD   21202

United States Attorney for
 the District of Maryland
Attn:  Civil Process Clerk
36 S. Charles Street
Baltimore, Maryland  21201

Attorney General of the United States
Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C.  20530-0001

Kelly Loeffler, Administrator
Small Business Administration
409 3rd Street, S.W
Washington, D.C.  20416

Business Finance Group, Inc.
c/o  Timothy P. Schwartz, Esq., Resident Agent
Bregman, Berbert, Schwartz & Gilday, LLC
Suite 800 West
7315 Wisconsin Ave.
Bethesda Maryland 20814-3206

And to all parties on the mailing matrix on file in this case.


                                          <u>/s/ Jeffrey M. Orenstein</u>
                                          Jeffrey M. Orenstein