UNITED STATES BANKRUPTCY COURT
DISTRICT OF MARYLAND
(Baltimore Division)

| | | |
|---|---|---|
| IN RE: | * | |
| THE INNOVATIVE TECHNOLOGIES GROUP & CO., LTD | * | No.  25-18000-DER Chapter 11 |
| | * | |
| Debtor | | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

APPLICATION FOR AUTHORITY TO EMPLOY
SMITH DUGGAN CORNELL & GOLLUB LLP AS SPECIAL COUNSELFOR DEBTOR

THE INNOVATIVE TECHNOLOGIES GROUP & CO., LTD, the Debtor and Debtor-in-Possession (the "Debtor"), files this Application for authority to Employ Smith Duggan Cornell & Gollub LLP ("Smith Duggan") as Special Counsel for the Debtor (the "Application"), and in support thereof state as follows:

Jurisdiction and Venue

1.      This Court has jurisdiction over this Application pursuant to 28 U.S.C. §§ 157 and 1334, and 11 U.S.C. § 327. This matter is a core proceeding, pursuant to 28 U.S.C. §157(b)(2)(A).

2.      Venue lies properly in this Court, pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The Application is made pursuant to Section 327(a) of Title 11 of the United States Code (the "Bankruptcy Code").

Background

4.      On August 29, 2025 (the "Petition Date"), the Debtor filed a Voluntary Petition for relief under Chapter 11 of the Bankruptcy Code, and, pursuant to §§ 1101 and 1107, will continue in the possession of its property and management of its business as a Debtor-in-Possession.

5.     The Debtor is a corporation that was formed under the laws of the State of Maryland on June 5, 1997.  Since that time, it has operated as a specialized manufacturer of process and quality control optical instruments serving the food and agriculture, packaging, and oil analysis industries.  Several of the instruments it manufactures are sole-source critical, highly technical, devices and components for companies that the Debtor has served for more than 25 years including any technological upgrades.  The Debtor has designed, invented and manufactured successful NIR products for companies over the course of its 28 years in business. Including selling the Unity Scientific Spectrastar product line to Westco Scientific in 2008 ($5,000,000 in sales per year at peak).  After the selling of the Unity Spectrastar product line in 2008, the debtor focused on continuing to provide the sole-source components, along with manufacturing consumables used in various analytical instruments and being a unique service provider for a variety instrumentation including support for instruments dating back to 1997.

6.     Over the course of its existence, the Debtor and its employees have successfully patented at least five inventions that have been unique to the products provided to its customers. One of those patents was assigned to, and remains property of, the Debtor.  The Debtor, its owners, and its employees are proud of the inventions and products the Debtor has produced and of the quality of service it has provided for nearly 30 years. With a customer base that depends on the Debtor to continue proper quality control for their products for the foreseeable future.

7.     The Debtor created a new NIR product line.  Over the course of 4 years, and through partnerships with influential customers, it was able to fully launch and begin to market that product line in 2014.  The Debtor decided to market and sell this product line directly as its own, unlike the typical OEM (Private Label) model, that it had used in the past.  The acceptance of this product led the Debtor to launch a wholly-owned sales and marketing subsidiary (Blue

Sun Scientific) in 2018 that began to sell and market its own brand Phoenix NIR product line in late 2019.  The Phoenix line began to have good acceptance within the marketplace based upon some unique, and innovative features that increased productivity in the food and agriculture markets.

8.      With a dedicated team of ten employees, including 6 full-time employees with an average of twenty years of service to the Debtor, the Debtor has maintained a strong reputation for quality and reliability.  The Debtor's annual sales range between $1,200,000.00 and $1,800,000.00, and it has a consistent history of meeting its financial obligations, including payroll, taxes, and supplier payments to dozens of vendors, while delivering products on time to its customers.

9.      On April 5, 2021, KPM Analytics North America Corporation ("KPM") a competitor of the Debtor, sued the Debtor, related company  Blue Sun Scientific, LLC ("Blue Sun"), and other individual defendants in the United States District Court for the District of Massachusetts (the "District Court"), asserting claims of trade secret misappropriation and tortious interference centered around the sales of the Phoenix NIR product line.  The initial basis of this lawsuit framed the accusations in a manner to imply that the technology for the Debtor's product was stolen from KPM through the hiring of new employees.  Initially a request for an injunction banning the creation of the instrumentation was requested and ultimately denied based on the fact that the Debtor was the original inventor of the technology in question.

10.     The suit was filed in Massachusetts notwithstanding that neither the Debtor nor any of the other defendants were located in the State of Massachusetts, and notwithstanding that there were no agreements between the parties or any of their predecessors that would have

permitted jurisdiction to be proper in Massachusetts. Respectfully, the District Court misapplied the law on jurisdiction and allowed the case to proceed in the District Court.

11.    In August of 2021, a vague preliminary injunction was issued restricting the customer base that was eligible to purchase the NIR instrument from the Debtor. As a result, there was confusion in the customer base that caused a pause in the growth of the product line.

12.    The Debtor and the other defendants endured two years of rigorous legal battles requiring the Debtor to spend large amounts of money for legal fees and, of equal importance, and occupying significant portions of the time of leadership in engineering, accounting and sales arms of the Debtor. In addition to creating a heavy debt burden, the distractions caused by the litigation led to less productivity and a reduction in sales growth.

13.    On May 17, 2023, the jury in the District Court litigation found in favor of the Debtor on the trade secret and misappropriation claims, but against the Debtor for tortious interference. The initial judgment amount allocated to the Debtor was $1,800,000.00.

14.    KPM released press releases on social media that created doubts among some of the Debtor's repeat customers and partners about the Debtor's long-term viability. This social media campaign created stagnation in sales for some of the Debtor's product lines.

15.    As legal fees mounted and cashflow became an issue, many of the key vendors of the Debtor began to demand advance payment terms. The vendors' demands significantly impacted the cashflow of the business. The Debtor made adjustments to the number of full-time employees that were on staff and began to use consultants less often.

16.    In order to maintain operations, the Debtor utilized its lines of credit to continue to get the necessary parts to make instrumentation to meet the needs of its customers. These debts continued to pile up as sales decreased slightly in 2024.

17.     In order to maintain its customer base, to overcome the negative publicity, and to attempt to attract new distribution channels, the Debtor chose not to increase the price points for their NIR product line.  While the end user pricing remained flat, changes in the economy meant that prices for components were increasing in general.  These increases were exacerbated by additional price increases due to the Debtor's inability to place larger bulk orders.  These changes further negatively affected the Debtor's cash flow.

18.     The Debtor was successful in brining on new countries for distribution in 2024 through its sales channel; however, there is typically an 18-month lead time for distributors to hit their full stride and, with this in mind, the Debtor does anticipate a significant growth in sales to begin until late 2025.  This too will have a significant impact on the cash flow and stability of the Debtor.

19.     On February 7, 2025, the District Court issued a final judgment in the litigation. The Judgment included interest and attorneys' fees and totaled more than $9,000,000.00.  The District Court also provided injunctive relief which sets out 46 companies in the United States to whom the Debtor cannot sell its NIR product line to for a period of 10 years.  While the injunction provides limitations on the Debtor's ability to market its products, the limitations in the injunction have served to clear up some of the market confusion and the Debtor believes that clarification will enable the Debtor to resume the growth trajectory that it saw pre-litigation.

20.     On February 26, 2025, the Debtor and Blue Sun engaged the service of Smith Duggan to handle the appeal from the District Court Judgment and on March 4, 2025, Smith Duggan, on behalf of the Debtor, noted an appeal from the Judgment entered by the District Court.  The appeal is currently pending in the United States Court of Appeals for the First Circuit

and, based upon the Schedule set by the First Circuit, the Debtor's Brief was due to be filed on or before September 3, 2025.

21.     With the appeal pending, on July 30, 2025. KPM enrolled the Judgment in the United States District Court for the District of Maryland and, without waiting the required 30 days to pursue collection action, sought and obtained Writs of Garnishment on the Debtor's bank accounts.

22.     But for the collection action, with the completion of the litigation at the trial court level and the appellate Brief being readied for filing, the Debtor's management team believed it was prepared to focus its full attention on growing the Phoenix product line, thus enabling the Debtor to reach its full potential while continuing to provide the devices, components and services that have been unaffected by litigation.

23.     Prior to the collection action by KPM, the Debtor was generally paying its debts as they came due and, but for what is believed to be an erroneous Judgment, the Debtor would have been able to operate without the intervention of this Court.

24.     Nonetheless, the Debtor knew that the Judgment was going to impact its business and recognized it would likely need to file for protection under the Bankruptcy Code.  The Writ of Garnishment sealed that decision and need.

<u>The Need for Legal Services</u>

25.     The single most important part of the Debtor's reorganization efforts is the pursuit of its appeal.

<u>The Employment of Smith Duggan as Special Counsel to the Debtor</u>

26.     The Debtor seeks to employ Smith Duggan as special counsel to continue to represent the Debtor in the appeal of the Judgment from the District Court.

27.     The Debtor initially selected Smith Duggan to represent it in the appeal because of its expertise in commercial and appellate litigation.  In the course of its pre-Petition services, Smith Duggan spent a significant amount of time becoming familiar with the Debtor's case and identifying issues to be addressed on appeal, and commencing the process of preparing Appellants' Brief.

28.     The Debtor believes that Smith Duggan is well qualified to represent the Debtor in the appeal and is more qualified than any other firm might be at this stage of the proceeding based upon its knowledge of the law and facts being addressed on appeal.

<u>The Services to be Rendered</u>

29.     The professional services that Smith Duggan hall render include:

    a.      Completing and filing Appellant's Brief;

    b.      Reviewing Appellee's Brief when filed;

    c.      Researching any new issues raised in Appellee's Brief;

    d.      Preparing and filing a Reply Brief; and

    e.      Attending Oral Argument

<u>Compensation</u>

30.     The Debtor desires to employ Smith Duggan under a general retainer because of the extensive legal services required.

31.     On or about March 20, 2025, Smith Duggan received an initial retainer of $20,000.00 from Blue Sun.  Per the terms of its engagement letter, the total retainer was to be $60,000.00 paid $20,000.00 per month.  Smith Duggan received those funds from Blue Sun and applied them to its invoices.  As of the Petition Date, Smith Duggan had Invoiced the Debtor and Blue Sun for services provided and had received a total of $118,896.70  from Blue Sun.  This

amount includes the $60,000.00 retainer payments that had been applied against the invoices and exhausted. As of the Petition Date, Smith Duggan was owed $33,818.30 for services provided and invoiced to the Debtor and Blue Sun. Additionally, there was approximately $65,000.00 in fees for Smith Duggan's services during the month of August that had not been billed as of the Petition Date.

32.     The bulk of the fees billed by Smith Duggan related to activities to permit Smith Duggan to get up to speed on the legal and factual issues in the underlying litigation and to assess the potential for a successful appeal. Based upon their research, Smith Duggan is beyond optimistic that the Judgment will be reversed due to the District Court's clear lack of jurisdiction. Smith Duggan also believes that there are significant errors relating to the substantive issues in the case which can be addressed in the appellate proceedings.

33.     At the time of the filing of the Debtor's Petition, Smith Duggan was actively working on the appellate brief which led to a significant portion of the current balance due and the unbilled work in process.

34.     In the course of the Debtor's case, Smith Duggan will continue to charge the Debtor on an hourly basis for time expended and on an actual dollar amount for expenses incurred plus reimbursement for ordinary out-of-pocket expenses. The hourly rates charged will reflect Smith Duggan's regular hourly billing rates for all partners, associates, paralegals and legal clerks, which is set out in more detail in the engagement agreement, a copy of which is attached hereto as **Exhibit 1**. These rates may be adjusted but not without at least thirty days' notice to the Debtor, the Court, and the Office of the United States Trustee.

## No Adverse Interest

35.     While Smith Duggan is a creditor of the Debtor, Smith Duggan does not represent or hold any interest adverse to the Debtor as a Debtor-in-Possession or to the Debtor's estate with regard to the appellate proceedings and is, therefore, qualified to represent the Debtor as special counsel pursuant to the provisions of 11 U.S.C. § 327(e).

36.     Smith Duggan has no connection to the Debtor except as disclosed above in connection with the pending appeal.

37.     Except as disclosed above, Smith Duggan has no connection with the Debtor's creditors, any other party in interest, their respective attorneys and accountants, the United States Trustee, or any person employed in the office of the United States Trustee.

## Disinterested Person

38.     Although Smith Duggan is not a "disinterested person" as that term is defined in § 101(14) of the Bankruptcy Code and as would be required to serve as general counsel to the Debtor under 11 U.S.C. § 327(a), as addressed above, Smith Duggan does not represents or hold any interest adverse to the Debtor as a Debtor-in-Possession or to the Debtor's estate in with respect to the matter on which it is to be employed - the appeal and is, therefore, qualified to represent the Debtor as special counsel pursuant to the provisions of 11 U.S.C. § 327(e).

## Best Interests of the Estate

39.     As set forth above, Smith Duggan satisfies all the requirements for employment as special counsel for the Debtor under 11 U.S.C. § 327(e).

40.     The employment of Smith Duggans special counsel for the Debtor is in the best interest of the Debtor, its estate, and its creditors as, among other things, Smith Duggan is already intimately familiar with the details of the issues to be addressed on appeal and is well in

process of preparing the Brief.  The costs of retaining new counsel to pick up at this point would be prohibitive, especially at this late date in the appellate proceedings.

WHEREFORE, the Debtor respectfully requests that the Court enter an order authorizing the Debtor to employ Smith Duggan as its special counsel under Section 327(e)  of the Bankruptcy Code and granting such other and further relief as is just and equitable.

THE INNOVATIVE TECHNOLOGIES
GROUP & CO., LTD

Dated: August 29, 2025                    /s/ Robert Wilt
                                          By:  ROBERT WILT, CEO

CERTIFICATE OF SERVICE

I HEREBY CERTIFY, that on the 10th day of September, 2025, (i) a copy of the foregoing Application for Authority to Employ Smith Duggan Cornell & Gollub LLP as Special Counsel for the Debtor , together with (ii) the Verified Statement of Attorneys to be Employed by Debtor, and (iii) a proposed Order, were served by electronic mail to:

Hugh M. Bernstein, Esq.
Office of the United States Trustee
101 W. Lombard Street
Suite 2625
Baltimore, Maryland 21202
hugh.m.bernstein@usdoj.gov

Carol J. Hulme, Esq.
General Attorney
Baltimore/Richmond Offices
Office of General Counsel
U.S. Small Business Administration
Carol-Ann.Hulme@sba.gov

Michael D. Nord, Esq.
Gebhardt and Smith, LLP
One South Street, Suite 2200
Baltimore, Maryland 21202
mnord@gebsmith.com

Timothy VanCisin, Esq.
Gebhardt and Smith, LLP
One South Street, Suite 2200
Baltimore, Maryland 21202
tvancisin@gebsmith.com

Copies of the same documents are being sent via first class mail, postage pre-paid to all parties on the mailing matrix and a separate Certificate of Service will be filed to evidence that service.

/s/ Jeffrey M. Orenstein
Jeffrey M. Orenstein