UNITED STATES BANKRUPTCY COURT
DISTRICT OF MARYLAND
(Baltimore Division)

IN RE:                                                    *

BLUE SUN SCIENTIFIC, LLC                    *      No.  25-17998-DER
                                                                   Chapter 11
            Debtor                                       *

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

IN RE:                                                    *

THE INNOVATIVE TECHNOLOGIES       *      No.  25-18000-DER
 GROUP & CO., LTD                                    Chapter 11
                                                                   *
            Debtor                                       Jointly administered under Case No.
                                                                   25-17998-DER

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

APPLICATION TO EMPLOY
ANDREW J. RUNGE AND CIRCLE FORENSIC CONSULTING, LLC

THE INNOVATIVE TECHNOLOGIES GROUP & CO., LTD, the Debtor and Debtor-

in-Possession (the "Debtor"), files this Application to Employ Andrew J. Runge and Circle

Forensic Consulting, LLC (the "Application"), and in support thereof state as follows:

Jurisdiction and Venue

1.      This Court has jurisdiction over this Application pursuant to 28 U.S.C. §§ 157 and

1334, and 11 U.S.C. § 327. This matter is a core proceeding, pursuant to 28 U.S.C.

§157(b)(2)(A).

2.      Venue lies properly in this Court, pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The Application is made pursuant to Section 327(a) of Title 11 of the United

States Code (the "Bankruptcy Code").

Background

4.       On August 29, 2025 (the "Petition Date"), the Debtor filed a Voluntary Petition for relief under Chapter 11 of the Bankruptcy Code, and, pursuant to §§ 1101 and 1107, will continue in the possession of its property and management of its business as a Debtor-in-Possession.

5.       The Debtor is a corporation that was formed under the laws of the State of Maryland on June 5, 1997.  Since that time, it has operated as a specialized manufacturer of process and quality control optical instruments serving the food and agriculture, packaging, and oil analysis industries.  Several of the instruments it manufactures are sole-source critical, highly technical, devices and components for companies that the Debtor has served for more than 25 years including any technological upgrades.  The Debtor has designed, invented and manufactured successful NIR products for companies over the course of its 28 years in business. Including selling the Unity Scientific Spectrastar product line to Westco Scientific in 2008 ($5,000,000 in sales per year at peak).  After the selling of the Unity Spectrastar product line in 2008, the debtor focused on continuing to provide the sole-source components, along with manufacturing consumables used in various analytical instruments and being a unique service provider for a variety instrumentation including support for instruments dating back to 1997.

6.       Over the course of its existence, the Debtor and its employees have successfully patented at least five inventions that have been unique to the products provided to its customers. One of those patents was assigned to, and remains property of, the Debtor.  The Debtor, its owners, and its employees are proud of the inventions and products the Debtor has produced and of the quality of service it has provided for nearly 30 years. With a customer base that depends on the Debtor to continue proper quality control for their products for the foreseeable future.

7.      The Debtor created a new NIR product line.  Over the course of 4 years, and through partnerships with influential customers, it was able to fully launch and begin to market that product line in 2014.  The Debtor decided to market and sell this product line directly as its own, unlike the typical OEM (Private Label) model, that it had used in the past.  The acceptance of this product led the Debtor to launch a wholly-owned sales and marketing subsidiary, Blue Sun Scientific, LLC ("Blue Sun") in 2018 that began to sell and market its own brand Phoenix NIR product line in late 2019.  The Phoenix line began to have good acceptance within the marketplace based upon some unique, and innovative features that increased productivity in the food and agriculture markets.

8.      With a dedicated team of ten employees, including 6 full-time employees with an average of twenty years of service to the Debtor, the Debtor has maintained a strong reputation for quality and reliability.  The Debtor's annual sales range between $1,200,000.00 and $1,800,000.00, and it has a consistent history of meeting its financial obligations, including payroll, taxes, and supplier payments to dozens of vendors, while delivering products on time to its customers.

9.      On April 5, 2021, KPM Analytics North America Corporation ("KPM") a competitor of the Debtor, sued the Debtor, Blue Sun, and a number of individuals in the United States District Court for the District of Massachusetts (the "District Court"), asserting claims of trade secret misappropriation and tortious interference centered around the sales of the Phoenix NIR product line.  The initial basis of this lawsuit framed the accusations in a manner to imply that the technology for the Debtor's product was stolen from KPM through the hiring of new employees.  Initially a request for an injunction banning the creation of the instrumentation was

requested and ultimately denied based on the fact that the Debtor was the original inventor of the technology in question.

10. The suit was filed in Massachusetts notwithstanding that neither the Debtor, Blue Sun, nor any of the other defendants were located in the Commonwealth of Massachusetts, and notwithstanding that there were no agreements between the parties or any of their predecessors that would have permitted jurisdiction to be proper in Massachusetts. Respectfully, the District Court misapplied the law on jurisdiction and allowed the case to proceed in the District Court.

11. In August of 2021, a vague preliminary injunction was issued restricting the customer base that was eligible to purchase the NIR instrument from the Debtor. As a result, there was confusion in the customer base that caused a pause in the growth of the product line.

12. The Debtor endured two years of rigorous legal battles requiring the Debtor to spend large amounts of money for legal fees. Of equal importance, the litigation occupied significant portions of the time of leadership in engineering, accounting and sales arms of the Debtor. Beyond creating a heavy debt burden, the distractions caused by the litigation led to less productivity and a reduction in sales growth.

13. On May 17, 2023, the jury in the District Court litigation found in favor of the Debtor on the trade secret and misappropriation claims, but against the Debtor for tortious interference. The initial judgment amount allocated to the Debtor was $1,800,000.00.

14. KPM released press releases on social media that created doubts among some of the Debtor's repeat customers and partners about the Debtor's long-term viability. This social media campaign created stagnation in sales for some of the Debtor's product lines.

15. As legal fees mounted and cash flow became an issue, many of the key vendors of the Debtor began to demand advance payment terms. The vendors' demands significantly

impacted the cash flow of the business. The Debtor made adjustments to the number of full-time employees that were on staff and began to use consultants less often.

16.     In order to maintain operations, the Debtor utilized its lines of credit to continue to get the necessary parts to make instrumentation to meet the needs of its customers.  These debts continued to pile up as sales decreased slightly in 2024.

17.     In order to maintain its customer base, to overcome the negative publicity, and to attempt to attract new distribution channels, the Debtor chose not to increase the price points for their NIR product line.  While the end user pricing remained flat, changes in the economy meant that prices for components were increasing in general.  These increases were exacerbated by additional price increases due to the Debtor's inability to place larger bulk orders.  These changes further negatively affected the Debtor's cash flow.

18.     The Debtor was successful in brining on new countries for distribution in 2024 through its sales channel; however, there is typically an 18-month lead time for distributors to hit their full stride and, with this in mind, the Debtor does anticipate a significant growth in sales to begin until late 2025.  This too will have a significant impact on the cash flow and stability of the Debtor.

19.     On February 7, 2025, the District Court issued a final judgment in the litigation. The Judgment included interest and attorneys' fees and totaled more than $9,000,000.00.  The District Court also provided injunctive relief which sets out 46 companies in the United States to whom the Debtor cannot sell its NIR product line to for a period of 10 years.  While the injunction provides limitations on the Debtor's ability to market its products, the limitations in the injunction have served to clear up some of the market confusion and the Debtor believes that clarification will enable the Debtor to resume the growth trajectory that it saw pre-litigation.

20.     On February 26, 2025, the Debtor and Blue Sun engaged the service of  Smith Duggan Cornell & Gollub LLP ("Smith Duggan") to handle the appeal from the Judgments entered against them in the District Court.  On March 4, 2025, Smith Duggan, on behalf of the Debtor and Blue Sun, noted an appeal from the Judgment entered by the District Court.  The appeal is currently pending in the United States Court of Appeals for the First Circuit and, based upon the schedule set by the First Circuit, the appellate Brief was due to be filed on or before September 3, 2025.  Based upon its research of the law and the facts, Smith Duggan is beyond optimistic that the Judgment will be reversed due to the District Court's clear lack of jurisdiction. Smith Duggan also believes that there are significant errors relating to the substantive issues in the case.

21.     With the appeal pending, on July 30, 2025, KPM enrolled the Judgment in the United States District Court for the District of Maryland and, without waiting the required 30 days to pursue collection action, sought and obtained Writs of Garnishment on the Debtor's bank accounts.

22.     But for the collection action, with the completion of the litigation at the trial court level and the appellate Brief being readied for filing, the Debtor's management team believed it was prepared to focus its full attention on growing the Phoenix product line, thus enabling the Debtor to reach its full potential while continuing to provide the devices, components and services that have been unaffected by litigation.

23.     Prior to the collection action by KPM, the Debtor was generally paying its debts as they came due and, but for what is believed to be an erroneous Judgment, the Debtor would have been able to operate without the intervention of this Court.

24. Nonetheless, the Debtor knew that the Judgment was going to impact its business and recognized it would likely need to file for protection under the Bankruptcy Code.

25. In advance of the enrollment of the Judgment in Maryland, the Debtor had consulted with Wolff & Orenstein, LLC ("W&O") to evaluate its options.  The Debtor retained W&O to engage in a detailed analysis of its finances to be able to assess what a Chapter 11 case might look like for the Debtor and might provide for creditors.

26.  After the entry of the Judgment in Massachusetts, and knowing collection action was on the horizon, the Debtor decided that it needed to pursue relief under Chapter 11 in this Court in order to maximize its chances for long-term success.  The only question was when. The issuance of the Writs of Garnishment and the freezing of its bank accounts resulting from the Writs sealed that decision.

<u>The Need for a Valuation Expert</u>

27. On April 29, 2026, the Debtor filed its Plan of Reorganization (the "Plan") and its Disclosure Statement in Support of Chapter 11 Plan of Reorganization Proposed by the Innovative Technologies Group & Co., LTD (the "Disclosure Statement").

28. On July 25, 2026, the Debtor filed its First Amended Disclosure Statement in Support of Chapter 11 Plan of Reorganization Proposed by the Innovative Technologies Group & Co., LTD (the "Amended Disclosure Statement").

29. On July 15, 2026, the Court entered its Amended Order Approving  First Amended Disclosure Statement in Support of Chapter 11 Plan of Reorganization Proposed by the Innovative Technologies Group & Co., LTD (the "Disclosure Statement Order").

30. Among other things, the Disclosure Statement Order provided:

b.      The Debtor shall file application(s) to employ expert witnesses within fourteen (14) days of the date of entry of this Order;

c.      The Debtor's expert witnesses and reports shall be disclosed as set forth in Fed. R. Civ. P. 26(a)(2) within thirty (30) days of the date of entry of an order approving the employment of the Debtor's expert witnesses;

31.     In Order to obtain confirmation of its Plan, the Debtor requires an expert to determine valuations of, among other things, the value of the Debtor and its assets, the liquidation value of the Debtor's assets, and the fair market value of the stock held by Robert Wilt, the sole owner of the Debtor

32.     Based upon his educational background and professional experience, and history of providing expert analyses and expert testimony trial testimony in courts including the United States Bankruptcy Court, the Debtor believes that Andrew J. Runge ("Mr. Runge") and Circle Forensic Consulting, LLC ("Circle") are well qualified to provide those services.  A copy of Mr. Runge's CV is attached hereto as **Exhibit 1**.

Compensation

33.     The Debtor desires to employ Mr. Runge and Circle (collectively referred to as "Experts") under the terms and conditions of the engagement agreement (the "Agreement") provided by Experts, a copy of which is attached hereto as **Exhibit 2**,

34.     As set out in detail in the Agreement, Experts have required a payment of $4,000.00 upon execution of the Agreement and an additional $11,000.00 prior to the provision of Experts' report.

35.     As set out in the Agreement, the fixed fees for reviewing the Debtor's financial information and preparing a Report do not include any services that may be required to defend

the Report our report in audits, litigation, including conferences, depositions, court appearances, hearings and/or testimony or any other required services. The Agreement provides that fees for such services will be billed at Mr. Runge's expert standard hourly rate and testimony at Mr. Runge's testimony rate, which is one hundred twenty-five percent (125%) of his standard hourly rates with a four hour minimum charge. Mr. Runge's standard hourly rate is currently $475.00 per hour.

36.     Based upon an informal survey of financial professionals that regularly provide services in this Court, including financial professionals who serve as Subchapter V Trustees, the Debtor believes that Mr. Runge's hourly rate, including his testimony rate, is a fair and reasonable rate.

## No Adverse Interest

37.     Experts represent no interest adverse to the Debtor as a Debtor-in-Possession or to the Debtor's estate in the matters upon which Experts are to be engaged for the Debtor.

38.     Experts have no connection to the Debtor.

39.     Experts have no connection with the Debtor's creditors, any other party in interest, their respective attorneys and accountants, the United States Trustee, or any person employed in the office of the United States Trustee.

## Disinterested Person

40.     Experts are a "disinterested person" as that term is defined in § 101(14) of the Bankruptcy Code.

<u>Best Interests of the Estate</u>

41.      As set forth above, and in the Verified Statement of Andrew Runge, Experts satisfy all the requirements for employment under 11 U.S.C. § 327.

42.      The employment of Experts for the purposes set forth herein, is in the best interest of the Debtor, its estate, and its creditors.

WHEREFORE, the Debtor respectfully requests that the Court enter an Order:

A.      Authorizing the Debtor to employ Experts under Section 327 of the Bankruptcy Code;

B.      Authorizing the Debtor to deliver the sum of $4,000.00 to Experts upon the entry of this Order;

C.      Authorizing the Debtor to deliver the sum of $11,000.00 to Experts twenty-five (25) days after the entry of this Order in exchange for the delivery of Experts' Report; and

D.      Granting such other and further relief as is just and equitable.

Respectfully submitted,

\s\ Jeffrey M. Orenstein
JEFFREY M. ORENSTEIN (#07512)
Wolff & Orenstein, LLC
15245 Shady Grove Road, Suite 465
Rockville, Maryland  20850
(301) 250-7232
jorenstein@wolawgroup.com

Counsel for the Debtor

CERTIFICATE OF SERVICE

I HEREBY CERTIFY, that on the 23rd day of July, 2026, (i) a copy of the foregoing Application, together with (ii) the Verified Statement of Attorneys to be Employed by Debtor, and (iii) a proposed Order, were served by electronic mail to:

Hugh M. Bernstein, Esq.
Office of the United States Trustee
101 W. Lombard Street
Suite 2625
Baltimore, Maryland 21202
hugh.m.bernstein@usdoj.gov

Michael D. Nord, Esq.
Gebhardt and Smith, LLP
One South Street, Suite 2200
Baltimore, Maryland 21202
mnord@gebsmith.com

Michael Benjamin Brown
Miles & Stockbridge, P.C.
100 Light Street
Baltimore, MD 21202
mbbrown@milesstockbridge.com

Addison Chappell, Esq.
Miles & Stockbridge, P.C.
100 Light Street
Baltimore, MD 21202
achappell@milesstockbridge.com

Maurice B. VerStandig, Esq.
The VerStandig Law Firm, LLC
9812 Falls Road, #114-160
Potomac, Maryland 20854
mac@mbvesq.com

Copies of the same documents are being sent via first class mail, postage pre-paid to all parties on the mailing matrix and a separate Certificate of Service will be filed to evidence that service.

/s/ Jeffrey M. Orenstein
Jeffrey M. Orenstein