# Circle Forensic Consulting, LLC

Where the Beginning Meets the End.

September 14, 2026

**Personal and Confidential**

Mr. Robert Wilt
Innovative Technologies Group, Inc.
ITGC -8017 Dorsey Run Road, Suite H
Jessup, MD 20794

Mr. Irvin Lucas
Blue Sun Scientific, LLC
8017 Dorsey Run Road
Jessup, MD 20794

Via E-Mail: Rwilt@itgc.com
Irvin@bluesunscientific.com

RE: Summary Valuation of a 100.0% Interest in Innovative Technologies Group, Inc. on a Controlling, Non-Marketable basis as of August 31, 2026, including its interest in Blue Sun Scientific, LLC.

Dear Mr. Wilt and Lucas:

I have performed as summary valuation of a 100.0% Interest ("subject Interest" in Innovative Technologies Group Inc. and Company. ("ITG" or the "Company") on a Controlling, Non-Marketable basis which includes Blue Sun Scientific, LLC ("BSS" or the "LLC") as of August 31, 2026.

We understand that the purpose of the Summary Valuation will be in support of a Plan of Reorganization that has been filed in the Bankruptcy Court and the Debtor's attempt to confirm that Plan. I performed our engagement in accordance with the Standards on Standards for Valuation Services of the American Institute of Certified Public Accountants (AICPA) and the Valuation Standards of National Association of Certified Valuation Analysts (NACVA).

The overall scope of my work and my approach was conducted in accordance with the Standards of the American Institute of Certified Public Accountants (AICPA). My report was prepared in accordance with standards set forth by the National Association of Certified Valuation Analysts and AICPA Standards for Valuation Services No. 1 (SSVS) and the Statement on Standards for Forensic Services.

As reflected on the attached Summary Valuation Report, and on the Exhibits, as of August 31, 2026:

The Company's has $0 value as a going concern and No liquidation value.

The following report and Exhibits provide greater detail related to our opinions in this matter. The opinions expressed in this report is contingent upon the conditions set forth in the Valuation section and the Statement of Assumptions and Limiting Conditions that are part of this report.

Neither Andrew J. Runge, CPA/ABV, CFF, CVA, CFE nor Circle Forensic Consulting, LLC have any interest in any of the parties to this matter. My work was performed at standard hourly rates or under a fixed fee agreement.. My compensation is in NO way dependent on any particular findings or opinions. My compensation is in NO way contingent upon any particular outcome or decision by any finder of fact. I am independent in this matter.

I have no responsibility to update this report for events and circumstances occurring subsequent to the date of this report. However, I reserve to the right to update or amend this report should any additional relevant information be provided to us.

Very truly yours,

AJRunge

**Andrew J. Runge, CPA/ABV, CFF, CVA, CFF**
**Managing Member**
**Circle Forensic Consulting, LLC**

# SUMMARY VALUATION OF A 100% INTEREST IN INNOVATIVE TECHNOLOGY GROUP, INC AND COMPANY ON A CONTROLLING, NON-MARKETABLE BASIS AS OF AUGUST 31, 2026

## TABLE OF CONTENTS


| | Page |
|---|---|
| INTRODUCTION………………………………………………………….… | 3 |
| HISTORICAL FINANCIAL STATEMENTS & ANALYSIS………………… | 7 |
| SUMMARY VALUATION ANALYSIS…………………………………………… | 9 |
| VALUATION SUMMARY & CONCLUSIONS……………………………….... | 17 |
| APPENDICES & SUPPLEMENTAL INFORMATION…………………………. | 26 |

## INTRODUCTION

### Objective

Circle Forensic Consulting, LLC ("Circle") prepared this summary opinion of value of a 100.0% Subject Interest in the Company on a controlling, Non-Marketable basis as of August 31, 2026. This report was prepared in accordance with standards set forth by the National Association of Certified Valuation Analysts and the American Institute of Certified Public Accountants.

| | |
|---|---|
| **Client's Name** | Robert Wilt & Irvin Lucas |
| **Entity's Name** | Innovative Technologies Group, Inc. and Company |
| **Type of Entity** | C Corporation |
| | |
| **Business Location** | MidAtlantic Area |
| **Business Interest Valued**<br>**Value of 100.0% Interest** | 100.0%<br>$0 (rounded) |
| **Standard of Value** | Fair Market Value |
| **Premise of Value** | Going Concern and Liquidation Value |
| **Basis of Subject Interest** | Controlling, Non-Marketable basis |
| **Effective Date of Appraisal** | August 31, 2026 |
| **Purpose and Intended Use of Appraisal** | Value of the Company in Bankruptcy |

In rendering this opinion, I have assumed, without independently verifying, the accuracy of the financial and other data provided to us by third parties and the Company. I understand that our conclusions will be used for the benefit of the Company, its members and their respective advisors related to its Bankruptcy Filings and other litigation .

I have performed a valuation engagement and present our summary valuation report in conformity with the "Statement of Standards for Valuation Services No. 1" (SSVS) of the American Institute of Certified Public Accountants. SSVS defines a valuation engagement as "an engagement to estimate value in which a valuation analyst determines an estimate of the value of a subject interest by performing appropriate procedures, as outlined in the SSVS, and is free to apply the valuation approaches and methods he or she deems appropriate in the circumstances. The valuation analyst expresses the results of the valuation engagement as a conclusion of value, which may be either a single amount or a range.

This valuation was performed solely for the purpose noted above, and the resulting estimate of value should not be used for any other purpose or by any other party for any purpose without our express written consent.
My analysis and report are in conformance with the 2022-2023 Uniform Standards of Professional Appraisal Practice ("USPAP") promulgated by the Appraisal Foundation,[1] the ethics and standards of

---

[1] The Appraisal Standards Board (ASB) of the Appraisal Foundation develops, interprets and amends the USPAP on behalf of appraisers and users of appraisal services. The Appraisal Foundation is authorized by

NACVA[2] and with IRS business valuation development and reporting guidelines.

Our analysis is also in conformance with various revenue rulings, including Revenue Ruling 59-60, which outline the approaches, methods and factors to be considered in valuing shares of capital stock in closely held corporations for federal tax purposes. Revenue Ruling 65-192 extended the concepts in Revenue Ruling 59-60 to income and other tax purposes as well as to business interests of any type.

The standard of value is fair market value, defined in Revenue Ruling 59-60 as:

> "The price at which the property would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, both parties having reasonable knowledge of relevant facts."

Revenue Ruling 59-60 also defines the willing buyer and seller as hypothetical as follows:

> "Court decisions frequently state in addition that the hypothetical buyer and seller are assumed to be able, as well as willing, to trade and to be well informed about the property and concerning the market for such property."

Furthermore, fair market value assumes that the price is transacted in cash or cash equivalents. Revenue Ruling 59-60, while used in tax valuations, is also used in many non-tax valuations.

Fair market value is also defined in a similar way in the International Glossary of Business Valuation Terms[3] as "the price, expressed in terms of cash equivalents, at which property would change hands between a hypothetical willing and able buyer and a hypothetical willing and able seller, acting at arm's length in an open and unrestricted market, when neither is under compulsion to buy or sell and when both have reasonable knowledge of the relevant facts."

The premise of value is going concern value.[4] The liquidation premise of value was considered and while the Company's management has no plans to liquidate its assets, similarly resulted on $0 salable, recoverable value. Had I performed this valuation on the a different premise of value, my opinion of value may be different.

---

Congress as the source of appraisal standards and appraiser qualifications. USPAP uses the term appraiser and appraisal report which are defined in U-1 and U-79, respectively. SSVS uses the terms valuation engagement and detailed report which are defined in pages 54 and 22-23, respectively. USPAP also uses the term appraiser while SSVS uses the term valuation analyst. We use the terms interchangeably in this report.

[2] NACVA - National Association of Certified Valuation Analysts.

[3] The International Glossary of Business Valuation Terms has been jointly adopted by the AICPA, NACVA and IBA.

[4] The *International Glossary of Business Valuation Terms* defines "Going Concern" as "an ongoing operating business enterprise," and "Going Concern Value" as "the value of a business enterprise that is expected to continue to operate into the future. The intangible elements of going concern value result from factors such as having a trained work force, an operational plant, and the necessary licenses, systems, and procedures in place."

In our conclusion of value, we considered the following factors, if relevant, which are specified in Revenue Ruling 59-60:

- The history and nature of the business
- The economic outlook of the United States and that of the specific industry in particular
- The book value of the subject company's equity and the financial condition of the business
- The earning capacity of the company
- The dividend-paying capacity of the company
- Whether or not the firm has goodwill or other intangible value
- Sales of the stock and size of the block of stock to be valued
- The market price of publicly traded stocks or corporations engaged in similar industries or lines of business

Our analysis included, but was not limited to, the above-mentioned factors.

1. In developing a value based on the fair market value standard, I determined a value that would provide a fair and reasonable return on investment to an investor or owner, in view of the facts available to us at the time. My opinion is based on, among other things, my estimate of the risk facing the Company and the return on investment that would be required on alternative investments with similar levels of risk. I considered various valuation methods in developing my opinion of value of the Company as of August 31, 2026.

2. A site visit and management interview was conducted with the owners of the Company. Both internal and external factors that influence the value of the Company were reviewed, analyzed and interpreted as possible.

3. Internal factors include:

    - The history and description of the Company
    - Operational and management characteristics of the Company
    - Practice legal, ownership, and capital structure
    - Historical financial information / financial analysis
    - Independent appraisal of the real estate owned by the Company

4. External factors include:

    - Competition within the industry
    - Local economy
    - National economy
    - Comparable sales data

**COMPANY HISTORY**

The Company is develops, manufactures and deploys instruments involving NIR Spectroscopy, robotics, electrical design, optics and assembly and repair services. The Company utilizes several patents not owned by the Company and the patents and intellectual property owned by the Company has little to no true value. Based on Management discussion and the ability of this intellectual property to be worked around with minimal effort.

## *Premise of Value*

We used a non-marketable, controlling interest premise of value in performing the valuation of the Business Interest. The following chart presents both the definitions and relationships among the separate "levels" of value:

| Obtain by: | Level of Value | Obtain by: |
|---|---|---|
| Valuing equity indirectly using "freely tradable" publicly traded comparable companies, add a control premium. | **Control Value** | Valuing equity directly using change of control transactions or other "control" methodologies. |
| | *Control Premium*↑ ↓ *Minority Interest Discount* | |
| Valuing equity indirectly using a "control" methodology, deduct a minority interest discount. | **"As if" Freely Traded Minority Interest Value** | Valuing equity directly using "freely tradable" publicly traded comparable companies. |
| | ↓ *Lack of Marketability Discount* | |
| Valuing equity indirectly using a "control" methodology, deduct minority interest and marketability discounts. | **Non-Marketable Minority Interest Value** | Valuing equity indirectly using "freely tradable" publicly traded comparable companies, deduct a marketability discount. |

where:

| | |
|---|---|
| **Control Value** | the value of the enterprise as a whole. |
| **"As-If" Freely Traded Minority Interest** | the value of a minority interest, lacking control, but with the benefit of market liquidity (public stocks). |
| **Non-Marketable Controlling Interest** | the value of a minority interest, having control *and* the benefit of a liquid market. |

# Financial Analysis

Summary financial information for the Company is presented throughout this report. This information was primarily extracted from the Company's 2022 through 2024 federal income tax returns and internally prepared accountant-compiled statements. I have not audited this financial data and, accordingly, do not express an opinion or any other form of assurance on it. The financial summaries presented in the appendices do not constitute a complete presentation of the Company's financial statements in accordance with generally accepted accounting principles. The information presented is included solely to assist in the development of the value conclusion presented in this report and should not be used to obtain credit or any other purpose.

## Adjustments to Financial Statements

When valuing a privately held business, a determination must be made if the financial statements require adjustments to best represent the "Fair Market Value" standard and reflect a best estimate of the Company's true future economic earnings potential. Adjustments to the financial statements generally fall into one of the following categories:

- **Normalizing Adjustments** – Nonrecurring or extraordinary events, discontinued operations, or other unusual items that may not reflect the business' future economic earnings capacity. Adjustments may be made to restate or approximate federal and state income taxes on the income statement when performing an appraisal analysis.

- **Pro-Forma Adjustments** – Certain discretionary expenses or related party revenue and expenses that reflect the results of the business' operations under conditions similar to what a prospective buyer might expect in the future. These types of adjustments are applicable when the ownership interest being valued has the ability to make such adjustments.

- **Adjustments Made**
- In this case we have adjusted owner's compensation to $250,000 per year and adjusted the applicable overheads to that level of compensation.
- Financial data was provide through August 31, 2026 we have annualized this data in our analysis

| | 2023 | 2024 | 2025 | July 31, 2026 | Annualized 2026 |
|---|---|---|---|---|---|
| **Income** | $ **1,764,912** | $ 3,178,316 | $ 1,249,961 | $ 670,759 | $ 1,149,879 |
| **Cost of Goods Sold** | 951,713 | 1,822,851 | 593,409 | 343,554 | 588,953 |
| **Gross Profit** | 813,199 | 1,355,465 | 656,552 | 327,205 | 560,926 |
| **Expense** | | | | | |
| **General and Administrative Expenses** | 1,646,507 | 1,169,006 | 437,974 | 211,936 | 363,321 |
| **Owner's Compensation** | 63,558 | 71,000 | 71,000 | 41,416 | 70,999 |
| **Total Expense** | 1,710,065 | 1,240,006 | 508,974 | 253,352 | 434,320 |
| **Net Ordinary Income** | **$ (896,866)** | **$ 115,459** | **$ 147,578** | **$ 73,853** | **$ 126,606** |

| | 2022 | 2023 | 2024 | 2025 | July 31, 2026 | Adjustments | Adjusted as of July 31, 2026 | |
|---|---|---|---|---|---|---|---|---|
| **ASSETS** | | | | | | | | |
| **Current Assets** | | | | | | | | |
| **Cash** | $ 37,339 | $ 134,610 | $ 183,653 | $ 39,476 | $ 19,226 | $ - | $ 19,226 | |
| **Trade Receivables** | 640,697 | 323,957 | 1,369,119 | 1,348,812 | 1,489,664 | - | 1,489,664 | |
| **Inventories** | 454,439 | 318,457 | 148,741 | 141,922 | 89,634 | - | 89,634 | |
| **Fixed Assets (net of depreciation)** | 7,136 | 4,940 | 3,842 | 4,940 | 4,940 | - | 4,940 | |
| **Other Current Assets** | 40,397 | 38,097 | 177,826 | 25,283 | 31,283 | - | 31,283 | |
| **Intangible Assets less Amortization** | 43,603 | 40,925 | 39,586 | 46,925 | 40,925 | (40,925) | - | (A) |
| **TOTAL ASSETS** | **$ 1,223,611** | **$ 860,986** | **$ 1,922,767** | **$ 1,607,358** | **$ 1,675,672** | **$ (40,925)** | **$ 1,634,747** | |
| **LIABILITIES & EQUITY** | | | | | | | | |
| **Accounts Payable** | $ 1,256,356 | $ 1,860,229 | $ 2,905,976 | $ 1,373,242 | $ 1,371,004 | | $ 1,371,004 | |
| **Current Debt** | 179,275 | 118,503 | 36,402 | | 32,302 | | 32,302 | |
| **Other Current** | 185,201 | 142,361 | 151,757 | 278,218 | (308,703) | 308,703 | - | (B) |
| **Loans from Shareholders** | 46,500 | 86,700 | 74,600 | 74,600 | 74,600 | | 74,600 | |
| **Long Term Debt** | 154,386 | 154,386 | 150,000 | 148,173 | 143,055 | | 143,055 | |
| **Estimated Litigation Costs** | | | | | - | 125,000 | 125,000 | (C) |
| **Additional Paid In Capital** | 10,001 | 10,001 | 10,001 | 10,001 | 10,001 | | 10,001 | |
| **Treasury Stock** | (41,220) | (41,220) | (41,220) | (41,220) | (41,220) | | (41,220) | |
| **Equity** | (566,888) | (1,469,974) | (1,364,749) | 320,780 | 394,633 | (474,628) | (79,995) | (D) |
| **TOTAL LIABILITIES & EQUITY** | **$ 1,223,611** | **$ 860,986** | **$ 1,922,767** | **$ 2,163,794** | **$ 1,675,672** | **$ (40,925)** | **$ 1,634,747** | |

**Notes:** **(A) Intangible Assets assumed to have no salable value.**
**(B) Adjust negative current assets against retained earnings.**
**(C) Estimated continuing legal expense based on attorney discussion.**
**(D) Equity adjusted on noted items.**

The Charts above show the general operating history and Balance Sheets from 2023 through August 31, 2026.

## Litigation

As of the valuation date, we were advised that an appeal of prior litigation is still open and that Bankruptcy filings continue in the Bankruptcy Court. These matters were discussed with legal counsel during the site visit and management interview to determine potential future litigation expenses which may be required. on-going or potential litigation other than the matter at hand..

## SUMMARY VALUATION

### Nature of the Ownership Interest

Before an opinion of value can be finalized, the nature of the ownership interest being valued and the expected income of the subject ownership interest must be addressed. The value of an ownership interest is influenced by many of its characteristics, including control and marketability.

We have been requested to determine the value of 50.0% of the Company on a Controlling, Non-Marketable, interest basis.

## VALUATION METHODS

Asset Approach – For businesses which are asset intensive or which have been unable to successfully demonstrate a period of positive earnings, an asset approach is often considered. Under an asset approach the value of the underlying assets either in-place or sold piece meal is considered. In this case, the value of the real estate is the most significant asset.

Like most companies, the total value of the Company is based on the value of income stream the Company is able to generate and not its assets. In this case, the net recoverable asset value is results in No Company Value. Additionally in this case, the Company has a history of negative adjusted after-tax operating results and declining revenue. Thus the Income Approach was considered along with the Adjusted Net Asset Method and Liquidation value. No sales of Company's deemed comparable were noted so this method was not utilized.

Income Approach – For entities which have a history of earnings, a capitalization rate is determined and applied to a stream of income or cash. We considered and utilized this approach in our findings.

Market Approach – The Market Approach seeks to obtain indications of value based on the comparability of the subject practice to other practices for which sales data is available. Comparable subject could be publicly traded companies or other private sales. After further detailed review of the available comparable company information we have not utilized this method in our final opinion.

### INCOME APPROACHES

Various income approaches are commonly utilized to indicate value of an entity, these include but are not limited to:

### INCOME CAPITALIZATION APPROACH

The income capitalization approach considers expected returns on an investment, which are capitalized at an appropriate rate of return to reflect the risks and potential reward associated therewith through three similar, yet different, methodologies.

1. The Discounted Future Earnings Approach involves projected earnings under certain assumptions with a residual value and utilization of present value factors. Relevant considerations include prevalent rate of return on investment constraints, business risks associated with the industry in which the Company operates, and those financial risks specifically attached to the Company per se.

2. The Discounted Future Cash Flow Approach is the same as (1) above except cash flow instead of net earnings is utilized.
3. The Capitalization of Future Dividends Approach involves a forecast of dividend growth, earnings retention, and return on investment constraints.
4. The Capitalization of Historical Earnings Approach utilizes past operating history as an indication of the capability to generate similar results in the future. Thus the relevant items noted in (1) above are considered, but rather than future projections, average weighted historic earnings are capitalized as an indication of value.

## INCOME APPROACH

The income approach estimates the fair market value of the Company based on the earnings, cash flow and dividend-paying capacity of the Company. The approach evaluates the present worth of the future economic benefits that accrue to the investors in a business. These benefits are discounted to present value at a rate of return that is commensurate with the Company's risk. This present value determines the fair market value of a company before the application of discounts.

The capitalization of earnings method ("COE") is a valid income approach method when the current earnings or cash flow of the subject entity are expected to grow at a more or less constant rate over a period of time or weighting can smooth the expected results. In this case, as the Asset Method resulted in No Value, we analyzed and applied the "COE" to the Company's operations.

There are two variables that have an effect on the COE method of valuation: the benefit stream to be capitalized and the capitalization rate, sometimes referred to in valuation theory as the "cap rate".

**Benefit Stream to be Capitalized**

In valuation theory, the estimated value of a subject company is based on the anticipated future benefits of an entity, not past results. Because of this, the valuation expert must be prudent to evaluate past results of operations to consider facts and circumstances as of the date of valuation, including any future events known or knowable as of that date. The end result of this evaluation is the selection of an appropriate benefit stream.

**Cost of Equity**

The capitalization rate developed for the cost of equity was computed using the build-up method. A market rate of investment return for the subject company is "built up" to represent the risk adjusted opportunity cost of investing in the subject equity (at an annual percentage rate). This opportunity cost represents the rate of return an investor would expect from an alternate equity investment of similar risk.

For the Company, I built-up the cost of equity by starting with a risk-free rate, or safe-rate of return based on the average market yield of long-term (twenty (20) years maturity) U.S. Treasury debt securities as of the valuation date. Investment theory states that the cost of equity capital can never be less than the risk-free rate of return available in the market. U.S. Treasury debt is deemed to be risk free because the federal government has the duty and the power to levy whatever tax is needed to pay the interest and principal on U.S. debt when it is due.

.

According to the Board of Governors of the Federal Reserve System, the 20-Year Treasury Constant Maturity Rate was 5.24% as of August 31, 2026.

We then apply various risk premiums from the Cost of Capital Navigator, which include:

Equity Risk Premium of 7.07% – which is the additional expected return for equities over the risk free rate.
Size Premium of 5.37% – which is the general additional risk premium for companies the relative small size as the subject company.
Company Specific Risk Premium of 5.00% – which related to the inherent risk present in the Company itself. The following factors contribute to analyzing this risk assessment:

- Interest Rate Risk
- Size of entity risk
- National economic risk

Finally, to convert the discount rate to a capitalization rate for the Company's expected income stream, a percentage is deducted to anticipate long-term sustainable growth. This percentage is based on a factor which takes into account future inflation and the growth rate. We have utilized an expected long term sustainable growth rate of 0.00%.

The calculated discount rate amounted to 22.68% and the resulting capitalization rate after deducting the sustainable rate of growth is 22.68%. We utilized a capitalization rate of 23.00%.

**Calculation of the Capitalization of Earnings Method**
The following is a calculation of the enterprise value of the Company using the capitalization of earnings method prior to application of discounts:

**CAPITALIZATION RATE**
**(Build Up Method)**

| Description | Amount | Notes |
|---|---|---|
| Risk Free Rate - Long Term 20 year Treasury Bond Yield | 5.24% | 20 year treasury bond rate as of August 31, 2026 |
| Equity Risk Premium | 7.07% | Per historical market data. |
| Size Premium | 5.37% | Per historical market data. |
| Company Risk Premium | 5.00% | Circle Estimate |
| Discount Rate | 22.68% | |
| Less: Estimated Long Term Growth Rate | 0.00% | Circle Estimate |
| Capitalization Rate | 22.68% | |
| **Capitalization Rate Utilized** | **23.00%** | |

**ADJUSTED AFTER TAX INCOME**

| Description | 2023 | 2024 | 2025 (A) | Through July 31, 2026 | Annualized 2026 |
|---|---|---|---|---|---|
| Net Income | $ (896,866) | $ 115,459 | $ 147,578 | $ 73,853 | $ 126,606 |
| Owner Compensation | 63,558 | 71,000 | 71,000 | 41,416 | 71,000 |
| Market Owner Compensation | (250,000) | (250,000) | (250,000) | (145,833) | (250,000) |
| Overhead Adjustment Owner Compensation | (14,915) | (14,320) | (14,320) | (8,353) | (14,320) |
| Rent Adjustment | (22,009) | (26,394) | (24,550) | (13,250) | (22,716) |
| Non-Deductible Meals | (3,680) | (2,002) | (2,002) | (1,168) | (2,002) |
| Other Adjustments | 677,232 | 3,974 | 69,086 | - | - |
| Adjusted Net Income (Seller's Discretionary Income) | (446,680) | (102,283) | (3,208) | (53,335) | (91,432) |
| Less: Provision for income Taxes @ 27.0% | (120,604) | (27,616) | (866) | (14,400) | (24,687) |
| Adjusted after Tax Net Income | $ (326,076) | $ (74,667) | $ (2,342) | $ (38,935) | $ (66,745) |
| Weighting | 1 | 1 | 1 | - | 1 |
| Weighted after Tax Income | $ (326,076) | $ (74,667) | $ (2,342) | $ - | $ (66,745) |
| Total | | | | | $ (469,830) |
| Weights | | | | | 4 |
| **Average weighted after tax income** | | | | | **$ (117,458)** |

Capitalization of Earnings is shown in the Chart below. See Exhibit C.

**CAPITALIZATION OF EARNINGS**

| Description | | Capitalization Of Earnings Method |
|---|---|---|
| Average Weighted Normalized After-tax Income (Exhibit D) | | $ (117,458) |
| Multiplied by growth rate (Exhibit E) | | 1.00 |
| Capitalization Base | | (117,458) |
| Divided by Capitalization Rate (Exhibit E) | | 23.00% |
| **Estimated Enterprise Value Before Discounts** | | **$ (510,685)** |
| Less: Discount for Lack of Marketability | 20% | (102,137) |
| Market Value on a Controlling, Non-Marketable Basis | | $ (408,548) |

As this Income Method produces a negative value as does the Adjusted Net Asset Method, we have considered it and applied weight to it in our analysis.

## Market Method

We did not find sufficient company sales which we deemed to be comparable to use this method.

**Defining Marketability and Its Commensurate Discount**

According to the *International Glossary of Business Valuation Terms* from the American Society of Appraisers, Marketability with regard to business interests is commonly defined as: *"The ability to quickly convert property to cash at minimal cost."*

Marketability, then, relates to the (lack of) *liquidity* of an investment relative to a comparable and actively traded alternative. In order to estimate the difference in the "non-marketable" price of a security as compared to its marketable counterpart, the non-marketable security is discounted relative to the price of its marketable counterpart. The discount for lack of marketability is typically stated as a percentage (or sometimes an amount) of a comparable marketable value. Therefore, as defined in the *International Glossary*, a *discount* for lack of marketability is defined as: *"An amount or percentage deducted from the value of an ownership interest to reflect the relative absence of marketability."*

**The Reason for a Discount for Lack of Marketability**

The reason for applying a discount to a business interest can apply whether the interest is either a control or minority position. According to Shannon Pratt, in Valuing A Business, 4th Edition, the rationale for such discount with a control interest is ordinarily based upon factors superficially described as follows:

*"…the controlling owner of a closely held business who wishes to liquidate his or her controlling ownership interest generally faces the following transactional considerations:"*

- *Uncertain time horizon to complete the offering or sale*
- *Cost to prepare for and execute the offering or sale*
- *Risk concerning eventual sale price*
- *Non-cash and deferred transaction proceeds*
- *Inability to hypothecate (i.e., the inability to borrow against the estimated value of the Stock)*

Consequently, a discount for lack of marketability is routinely considered appropriate in small, closely held businesses. Such discount is intended to reflect the lack of an active market for sale of the stock.

The US Tax Court has recognized that discounts for lack of marketability are appropriate for controlling ownership interests in closely held companies. In the *Estate of Andrews v. Commissioner* the Court noted:

> *"Even controlling shares in a nonpublic corporation suffer from lack of marketability because of the absence of a ready private placement market and the fact that flotation costs would have to be incurred if the corporation were to publicly offer its stock."*

If controlling interests in closely held companies must be discounted for their lack of liquidity, then minority interests are self evidently more affected. Shannon Pratt in *Business Valuation Discounts and Premiums* noted the rationale for such a discount with a minority interest is driven by many factors including:

- "Put" rights, if any
- Dividends or distributions available for minority interest holders

- Size of the potential market for buyers
- Prospects for going public or being acquired
- Restrictions on transferability of the minority interest
- Relative size and financial strength of the aggregate entity
- Size of the minority interest, particularly if a "swing" vote applies

**The Impact of a Discount for Lack of Marketability**

Thus when comparing two investment options identical in all other ways, the market will provide a considerable premium to the one that can be liquidated into cash immediately and with no loss of value. Without access to markets or the ability to quickly and efficiently convert an investment option into cash, liquidity including an investor's ability to control the timing of potential gains, manage or avoid losses and to minimize the transaction costs associated with alternative investments is substantially impaired. For these reasons, an investment in a privately held company or partnership is worth less than an otherwise comparable investment in a publicly traded enterprise.

Along the same lines, impairment of marketability results in illiquidity, which increases a prudent investor's expected or required rate of return to compensate for the lack of liquidity. To quantify and justify an investment with such a lack of liquidity an investor would look to the market to determine empirical and objective sources of data. This market and empirical data is most often encompassed in a variety of studies and court decisions.

**Objective Sources of Discounts for Lack of Marketability**

The discount a prudent investor would apply is based on the individual facts and circumstances and can often be significant when compared to the indicated value of a company or partnership as a whole. Lacking direct market data, investors often utilize studies and court cases as an estimate by proxy of the required marketability discount in a given case. These studies have typically fallen into the following categories:

- **Restricted Stock Studies** – These studies range from 1972 through 1995 and have found discounts ranging from 26% to 45% with an average discount of 34%.

- **Pre-IPO Studies** – These studies were more recently completed than the Restricted Stock Studies and indicated discounts from 30% to 45% and typically averaged 35% to 45%.

- **Court Decisions** – These decisions, which cannot be applied across the board, do provide some indications for the determination of marketability discounts. Some of the more recent and widely disseminated cases found discounts ranging from 10% to 35%, with the current trend towards allowing higher discounts.

- **Independent Studies** – Various studies have been done to analyze or attempt to calculate discounts for lack of marketability.

**Restricted Stock Studies**

These studies, with the exception of the Willamette study, were based on Rule 144 stock that limits the transfer of stock for two years after its issuance, at which time it becomes liquid. The discounts determined were based on comparisons between the discounted prices of restricted securities to publicly traded securities in the same companies. Since the restricted stock is identical in all respects to the traded stock except for marketability, the difference in value is the imputed marketability

discount. Results of these studies are summarized below:

| SUMMARY OF RESTRICTED STOCK STUDIES | |
|---|---|
| Study | Discount |
| Gelman | 33.0% |
| Trout | 33.5% |
| Moroney | 35.6% |
| Maher | 35.4% |
| Standard Research Consultants | 45.0% |
| Willamette Management Associates, Inc. | 31.2% |
| SEC Overall Average | 25.8% |
| Summary of Restricted Stock Studies | 33.0% |
| **Mean Discount** | **34.1%** |

**Pre-IPO Studies**

A second set of studies analyzed the difference in the prices of companies whose shares were initially offered to the public (IPO) and the prices at which these shares traded privately within a five month period immediately preceding the public offering. Results of these studies are summarized below.

- **Emory Studies 1980-1995**
  This study of 206 IPOs indicated discounts in the highest range of 83% and 94% respectively with the majority of discounts over 30%. The mean discount was 44% and the median discount was 43%.

- **Willamette Management Associates Studies 1975-1993**
  This Study of 432 companies and 827 IPO transactions indicated median discounts for each period ranged from 31.8% to 73.1% and the median of all time periods was 51.9%.

- **Cost of Flotation Studies**
  These 2 studies, 1974 and 1987 quantify the impact of floating securities, thus representing the "cash" to gain liquidity. The studies indicate costs of flotation of 12.4% and 17.7%, respectively. Note that flotation costs address only the initial flotation of securities, and do not address subsequent illiquidity differences, if any.

**Court Decisions**

Further guidance for marketability discounts can be found in various court decisions. These decisions provide insight into the discounts allowed in various circumstances. We look at evidence from court decisions, not to cite as direct evidence in the instant case, but to review how courts have previously interpreted the objective evidence presented. In addition, we look to court cases for general guidance concerning the nature of evidence deemed acceptable in previous decisions.

The following court cases are not intended to provide an exhaustive list since each case is distinctly related to the facts and circumstances of the matter. However, it provides a chronology of some of the cases considered significant within the context of the discount for lack of marketability.

In **Estate of Berg v. Commissioner** (61 TCM 1991-279), the Tax Court relied upon an expert's analysis of specific factors that influenced the magnitude of a minority interest discount (20%) and a marketability discount (10%). The expert's specificity appeared to be persuasive to the court. Other experts in the Berg case were admonished by the court for presenting discount analyses that were "exceedingly general and lacking in specific analysis."

In **Estate of Lauder v. Commissioner** (60 T.C.M. (CCH) 977, 1990), (64 T.C.M. (CCH) 1643, 1992) and (68 T.C.M. (CCH) 985 1994) the Court allowed a 40% discount for lack of marketability in EJL, the holding company for Estee Lauder, USA and related companies. All the companies had been successful historically.

The decedent held 20.6% of the stock which was subject to a restrictive transfer agreement giving EJL (and remaining shareholders if necessary) right of first refusal at a price based on adjusted book value. Even without EJL/shareholder purchase sale to a third party required EJL's consent. In two early cases the issue of whether the restrictive shareholder agreement should control value for federal estate tax purposes was focused upon.

In the first trial the Court indicated that values may be enforced through enforceable buy-sell agreements. However, it required further examination of the facts and circumstances to determine whether such buy-sell governed in valuing the shares for federal estate tax purposes. In the second trial the Court found that EJL's agreement did not meet the long-established criteria necessary for the agreement to control value. The following elements were required to be present:

- The agreement must fix the price.
- It must bind parties in life and death.
- It must have been entered into for a bona fide business reason.
- It must also not be a substitute for testamentary disposition.

In **Estate of Mildred Herschede Jung v. Commissioner** (101 TIC. No. 28 412, 1993), the Tax Court allowed a 35% discount for lack of marketability for a 21% interest in Jung Corp., a manufacturer and distributor of elastic textile goods. Jung's revenues ($68 million) and profits ($3.1 million) had been growing for several years, a dividend was being paid, and there was a reasonable knowledge that the company could be an attractive acquisition candidate. Of particular note is that the court relied upon several of the empirical studies cited above.

An estate tax case, **Estate of Mandelbaum v. Commissioner** (69 T.C.M. (CCH) 2852, 1995 concerned the discount for illiquidity, (which the Court determined as 30%) and indicated specific application to the case's circumstances as follows:

- Financial statement analysis
- Dividend policy
- Nature of the company, its history, its position in the industry, and its economic outlook
- Management
- Amount of control in the transferred shares
- Restriction on transferability
- Holding period for the stock
- Company's redemption policy
- Costs associated with a public offering

**Conclusion and Rationale of Discount for Lack of Marketability**

As detailed above, the application of a discount for lack of marketability can be estimated based on some or all of the previously noted Restricted Stock Studies, Pre-IPO studies, Flotation Costs and Court Decisions.

We have summarized the results of the studies and the relative comparability to the Company below.

| Source | % Range | Average | Applicability to Company |
|---|---|---|---|
| Restricted Stock | 25.8% - 45.0% | 34.1% | Relatively Close |
| Pre-IPO | 0% - 94% | 47.5% | Very Little |
| Flotation Costs | 12.4% -17.7% | 15.1% | Very Little |
| Court Decisions | 10% - 40% | 37.4% | Moderate |
| Average Result | | 33.5% | |

We have considered all the relevant factors and believe that in this case, and in my opinion the marketability discount applicable to the Company is 20.0%.

As the subject interest being valued is a controlling interest, no discount for lack of control is required.

**WEIGHTING**

Based on the data available, I have applied weighting as follows 50% to the Net Asset Method, 50% to the Capitalization of Earnings Method and 0% to the Comparable Company Market Method.

**OPINION OF VALUE**

As reflected on Exhibit A, in my professional opinion to a reasonable degree of accounting certainty based on the information and documentation available to me, the value of 100.0% of the Company as of August 31, 2026:

Going Concern Value $0

Liquidation Value $0

See the foregoing Chart and see Exhibit A.

**SUMMARY CONCLUSION OF VALUE**
**AS OF AUGUST 31, 2026**

| DESCRIPTION | Amount | | Weighting | Weighted Amount |
|---|---|---|---|---|
| Adjusted Net Asset Method (Exh B) | $ - | (A) | 50% | $ - |
| Capitalization of Earnings (Exh C) | $ - | (B) | 50% | - |
| Market Method | N/A | (C) | 0% | - |
| **Total Value of 100% Interest (rounded)** | | | **100%** | **$ -** |

Notes: (A) Based on adjusted July 31, 2026 balance sheet. See. Exhibit B.
(B) Based on Company's after-tax adjusted weighted income. See Exhibit C.
(C) No Company's deemed comparable were noted.

See the foregoing Chart and see Exhibit A.

This conclusion is subject to the Statement of Assumptions and Limiting Conditions and to the Valuators' Representation/Certification found in Appendices of this report. I have no obligation to update this report or our conclusion of value for information that comes to our attention after the date of this report. However, I do reserve the right to update my opinions should additional relevant information be received.

Circle Forensic Consulting, LLC nor any of its Members have any direct or indirect ownership or interest in the Company. We are independent in this matter. My work was performed on a fixed fee or hourly basis and payment of our fees is in no way contingent upon any particular opinion or finding by us.

Best regards,

**Circle Forensic Consulting, LLC**

Andrew J. Runge, CPA/ABV, CFF, CVA, CFE, MBA
Managing Member
September 14, 2026

# EXHIBITS

**EXHIBIT A**

**SUMMARY CONCLUSION OF VALUE**
**AS OF AUGUST 31, 2026**

| DESCRIPTION | Amount | | Weighting | Weighted Amount |
|---|---|---|---|---|
| Adjusted Net Asset Method (Exh B) | $ - | (A) | 50% | $ - |
| Capitalization of Earnings (Exh C) | $ - | (B) | 50% | - |
| Market Method | N/A | (C) | 0% | - |
| **Total Value of 100% Interest (rounded)** | | | **100%** | **$ -** |

Notes: (A) Based on adjusted July 31, 2026 balance sheet. See. Exhibit B.
(B) Based on Company's after-tax adjusted weighted income. See Exhibit C.
(C) No Company's deemed comparable were noted.

**EXHIBIT B**

**SUMMARY OF BALANCE SHEETS**

| | 2022 | 2023 | 2024 | 2025 | July 31, 2026 | Adjustments | Adjusted as of July 31, 2026 | |
|---|---|---|---|---|---|---|---|---|
| **ASSETS** | | | | | | | | |
| **Current Assets** | | | | | | | | |
| **Cash** | $ 37,339 | $ 134,610 | $ 183,653 | $ 39,476 | $ 19,226 | $ - | $ 19,226 | |
| **Trade Receivables** | 640,697 | 323,957 | 1,369,119 | 1,348,812 | 1,489,664 | - | 1,489,664 | |
| **Inventories** | 454,439 | 318,457 | 148,741 | 141,922 | 89,634 | - | 89,634 | |
| **Fixed Assets (net of depreciation)** | 7,136 | 4,940 | 3,842 | 4,940 | 4,940 | - | 4,940 | |
| **Other Current Assets** | 40,397 | 38,097 | 177,826 | 25,283 | 31,283 | - | 31,283 | |
| **Intangible Assets less Amortization** | 43,603 | 40,925 | 39,586 | 46,925 | 40,925 | (40,925) | - | (A) |
| **TOTAL ASSETS** | **$ 1,223,611** | **$ 860,986** | **$ 1,922,767** | **$ 1,607,358** | **$ 1,675,672** | **$ (40,925)** | **$ 1,634,747** | |
| **LIABILITIES & EQUITY** | | | | | | | | |
| **Accounts Payable** | $ 1,256,356 | $ 1,860,229 | $ 2,905,976 | $ 1,373,242 | $ 1,371,004 | | $ 1,371,004 | |
| **Current Debt** | 179,275 | 118,503 | 36,402 | | 32,302 | | 32,302 | |
| **Other Current** | 185,201 | 142,361 | 151,757 | 278,218 | (308,703) | 308,703 | - | (B) |
| **Loans from Shareholders** | 46,500 | 86,700 | 74,600 | 74,600 | 74,600 | | 74,600 | |
| **Long Term Debt** | 154,386 | 154,386 | 150,000 | 148,173 | 143,055 | | 143,055 | |
| **Estimated Litigation Costs** | | | | | - | 125,000 | 125,000 | (C) |
| **Additional Paid In Capital** | 10,001 | 10,001 | 10,001 | 10,001 | 10,001 | | 10,001 | |
| **Treasury Stock** | (41,220) | (41,220) | (41,220) | (41,220) | (41,220) | | (41,220) | |
| **Equity** | (566,888) | (1,469,974) | (1,364,749) | 320,780 | 394,633 | (474,628) | (79,995) | (D) |
| **TOTAL LIABILITIES & EQUITY** | **$ 1,223,611** | **$ 860,986** | **$ 1,922,767** | **$ 2,163,794** | **$ 1,675,672** | **$ (40,925)** | **$ 1,634,747** | |

**Notes:** **(A) Intangble Assets assumed to have no salable value**
**(B) Adjust negative current assets against retained earnings.**
**(C) Estimated continuing legal expense based on attorney discussion.**
**(D) Equity adjusted on noted items.**

**EXHIBIT C**

**CAPITALIZATION OF EARNINGS**

| **Description** | | **Capitalization Of Earnings Method** |
|---|---|---|
| Average Weighted Normalized After-tax Income (Exhibit D) | | $ (117,458) |
| Multiplied by growth rate (Exhibit E) | | 1.00 |
| Capitalization Base | | (117,458) |
| Divided by Capitalization Rate (Exhibit E) | | 23.00% |
| **Estimated Enterprise Value Before Discounts** | | **$ (510,685)** |
| Less: Discount for Lack of Marketability | 20% | (102,137) |
| Market Value on a Controlling, Non-Marketable Basis | | $ (408,548) |

**EXHIBIT D**

**ADJUSTED AFTER TAX INCOME**

| **Description** | **2023** | **2024** | **2025 (A)** | Through July 31, **2026** | Annualized **2026** |
|---|---|---|---|---|---|
| Net Income | $ (896,866) | $ 115,459 | $ 147,578 | $ 73,853 | $ 126,606 |
| Owner Compensation | 63,558 | 71,000 | 71,000 | 41,416 | 71,000 |
| Market Owner Compensation | (250,000) | (250,000) | (250,000) | (145,833) | (250,000) |
| Overhead Adjustment Owner Compensation | (14,915) | (14,320) | (14,320) | (8,353) | (14,320) |
| Rent Adjustment | (22,009) | (26,394) | (24,550) | (13,250) | (22,716) |
| Non-Deductible Meals | (3,680) | (2,002) | (2,002) | (1,168) | (2,002) |
| Other Adjustments | 677,232 | 3,974 | 69,086 | - | - |
| Adjusted Net Income (Seller's Discretionary Income) | (446,680) | (102,283) | (3,208) | (53,335) | (91,432) |
| Less: Provision for income Taxes @ 27.0% | (120,604) | (27,616) | (866) | (14,400) | (24,687) |
| Adjusted after Tax Net Income | $ (326,076) | $ (74,667) | $ (2,342) | $ (38,935) | $ (66,745) |
| Weighting | 1 | 1 | 1 | - | 1 |
| Weighted after Tax Income | $ (326,076) | $ (74,667) | $ (2,342) | $ - | $ (66,745) |
| Total | | | | | $ (469,830) |
| Weights | | | | | 4 |
| **Average weighted after tax income** | | | | | **$ (117,458)** |

**EXHIBIT E**

## CAPITALIZATION RATE
## (Build Up Method)

| Description | Amount | Notes |
|---|---|---|
| Risk Free Rate - Long Term 20 year Treasury Bond Yield | 5.24% | 20 year treasury bond rate as of August 31, 2026 |
| Equity Risk Premium | 7.07% | Per historical market data. |
| Size Premium | 5.37% | Per historical market data. |
| Company Risk Premium | 5.00% | Circle Estimate |
| Discount Rate | 22.68% | |
| Less: Estimated Long Term Growth Rate | 0.00% | Circle Estimate |
| Capitalization Rate | 22.68% | |
| **Capitalization Rate Utilized** | **23.00%** | |

EXHIBIT F

## SUMMARY OF INCOME STATEMENTS

| | 2023 | 2024 | 2025 | July 31, 2026 | Annualized 2026 |
|---|---|---|---|---|---|
| **Income** | **$ 1,764,912** | $ 3,178,316 | $ 1,249,961 | $ 670,759 | $ 1,149,879 |
| **Cost of Goods Sold** | 951,713 | 1,822,851 | 593,409 | 343,554 | 588,953 |
| **Gross Profit** | 813,199 | 1,355,465 | 656,552 | 327,205 | 560,926 |
| **Expense** | | | | | |
| **General and Administrative Expenses** | 1,646,507 | 1,169,006 | 437,974 | 211,936 | 363,321 |
| **Owner's Compensation** | 63,558 | 71,000 | 71,000 | 41,416 | 70,999 |
| **Total Expense** | 1,710,065 | 1,240,006 | 508,974 | 253,352 | 434,320 |
| **Net Ordinary Income** | **$ (896,866)** | **$ 115,459** | **$ 147,578** | **$ 73,853** | **$ 126,606** |

# APPENDICES

# APPENDIX A – ASSUMPTIONS AND LIMITING CONDITIONS

1. No investigation has been made of, and no responsibility is assumed for, the legal description or for legal matters including title or encumbrances. Title to all property is assumed good and marketable unless otherwise stated. All property is further assumed free and clear of any or all liens, easements or encumbrances unless otherwise stated.
2. Information furnished by others, upon which all or portions of this report are based, is believed to be reliable; however, no warranty is given as to the accuracy of such information. The Company and its management warranted to us that the information supplied to us was complete and correct to the best of their knowledge. It has been assumed that all facts and circumstances that would significantly affect the appraisal results have been disclosed to us. Any significant errors in, or omissions from, the information supplied to us will have a corresponding effect on our analyses and conclusions.
3. No responsibility is taken for changes in market conditions and no obligation is assumed to revise this report to reflect events or conditions that occur subsequent to the date hereof.
4. Full compliance with all applicable federal, state, and local zoning, use, environmental and similar laws, and regulations is assumed. It is assumed that all required licenses, certificates of occupancy, consents or other legislative or administrative authority from any local, state or national government or private entity or organization have been or can be obtained or renewed for any use on which the value estimate contained in this report is based.
5. This engagement is limited to the opinion of the Fair Market Value of a 100% Equity Interest in the Company as of August 31, 2026, to be used in connection with above captioned matter.
6. Neither Circle Forensic Consulting, LLC, nor any individuals signing or associated with this report shall be required because of this report to give testimony or appear in court or other legal proceedings, unless specific arrangements therefore have been made.
7. We were limited to the production of financial statements for the Company through the period ended July 31, 2026. Had we been provided with other information, our conclusions may have been different.
8. We have compiled summary financial data and ratios that are contained in the report and various appendices. The data in these appendices represent financial data extracted from the Company’s historical financial statements as well as other sources. We have not audited or reviewed this financial data and, accordingly, do not express an opinion or any other form of assurance on it. The financial summaries presented in the appendices do not constitute a complete presentation of the Company’s financial statements in accordance with generally accepted accounting principles.
9. We have conducted a Management Interview.
10. We have performed a site visit.

| STUDY | Years Covered By Study | Number Of Transactions | Average Discount | Median Discount |
|---|---|---|---|---|
| SEC Institutional Investor Study | 1966-1969 | 398 | 26% | 24% |
| Gelman Study | 1968-1970 | 89 | 33% | 33% |
| Trout Study | 1968-1972 | 60 | 33% | 34% |
| Moroney Study | 1968-1972 | 146 | 36% | 35% |
| Maher Study | 1969-1973 | 33 | 35% | 35% |
| Standard Research Consultants | 1978-1982 | 28 | N/A | 45% |
| FMV Opinions, Inc. | 1980-1997 | 243 | 22% | 20% |
| Management Planning, Inc. | 1980-1996 | 49 | 27% | 29% |
| Willamette Mgmt. Associates, Inc. | 1981-1984 | 1,007 | 42% | 52% |
| Silber Study | 1981-1988 | 69 | 34% | N/A |
| Johnson Study | 1991-1995 | 72 | 20% | N/A |
| Columbia Financial Advisors | 1996-1997 | 23 | 21% | 14% |
| Columbia Financial Advisors | 1997-1998 | 15 | 13% | 9% |

**Liquidity Discounts Evidenced By Prices of Restricted Stocks**

A "restricted stock" is identical to the freely traded stock of a public company except that it is restricted from sale on the open market for a period of time. Because relative liquidity is the only difference between the restricted stock and unrestricted stock in the same company, this difference provides evidence of the price discount between a freely marketable share and one that is identical but subject to restricted liquidity.

**Institutional Investor Study Published by the Securities and Exchange Commission**

In a major Securities Exchange Commission (SEC) study of institutional investor behavior, one topic was the amount of discount at which sales of letter stock took place compared to the prices of identical unrestricted stock on the open market. The observed discounts ranged from 80% to premiums near 15%.

This study examined discounts in three hundred ninety-eight (398) transactions between 1966 and 1969 involving securities restricted under Rule 144 of the Securities Act of 1933 and is the basis for Revenue Ruling 77-287. The SEC examined the discounts at which the restricted securities were sold relative to the prices of unrestricted, but otherwise identical, stock in the open market.

The SEC examined each discount in relation to several factors believed to play a role in determining the magnitude of the observed discount, including the trading market for the issuer's publicly traded stock, the net sales and earnings of the issuer, and the size of the block of restricted stock both in dollar terms and as a percentage of the market capitalization of the issuer.

As Revenue Ruling 77-287 noted, the magnitude of the discount for restricted securities from the trading price of the unrestricted securities was generally related to the following four factors: (1) Earnings played the major part in establishing the ultimate discounts at which these stocks were sold from the current market price, indicating earnings patterns, rather than sales patterns, determine the degree of risk of an investment; (2) Companies with the lowest dollar amount of sales during the test period accounted for most of the transactions involving the highest discount rates, while they accounted for only a small portion of all transactions involving the lowest rates; (3) Discount rates were greatest on restricted stocks with unrestricted counterparts traded over-the-counter, followed by those with unrestricted counterparts listed on the American Stock Exchange, while the discount rates for those stocks with unrestricted counterparts listed on the New York Stock Exchange were the smallest and; (4) In judging the opportunity cost of freezing funds, the purchaser is analyzing two separate factors.

The first is the risk that the underlying value of the stock will change in a way that, absent the restrictive provisions, would have prompted a decision to sell. The second factor is the risk that the means of legally disposing of the stock may not materialize. From the seller's point of view, a discount is justified where the seller is relieved of the expenses of registration and public distribution, as well as the risk that the market will adversely change before the offering is completed.

Another reason that liquidity takes a high degree of importance for common stocks is that the stock's prices tend to be much more volatile than prices of real estate or other securities such as preferred stocks or bonds. Consequently, the investor's choice as to the timing of the sale of the stock is much more important in determining the amount of return to be earned on the investment than is the case with other security investments.

**Institutional Investors Study by the Securities and Exchange Commission**
**Average Discounts on Purchases of Restricted Common Stock**
**Classified by Institutional Purchaser and Trading Markets**
**January 1, 1966 - June 30, 1969**

| CLASS OF INSTITUTION | N.Y.S.E. | A.S.E. | OTC - R.P.G. | OTC - Non-R.P.G. |
|---|---|---|---|---|
| Banks | 18.7 | 22.5 | 25.6 | 31.9 |
| Investment Advisors | 21.6 | 25.4 | 28.5 | 34.8 |
| Life Insurance Companies | 19.9 | 23.7 | 26.8 | 33.1 |
| Venture Capital Companies | 32.5 | 36.3 | 39.4 | 45.7 |
| Other Institutions | 9.2 | 13.0 | 16.1 | 22.4 |

The average discount for the three hundred ninety-eight (398) transactions was twenty-five and eight-tenths percent (25.8%).

**Gelman Study**

The Gelman Study is the first of three often-cited restricted stock studies from the early to mid 1970s was published in *Journal of Taxation* in 1972. Gelman analyzed the prices paid for restricted securities by four closed-end investment funds over a period beginning in 1968 and ending in 1970. The four funds were established in 1968 and by the end of 1970 had assets ranging from sixteen million

($16,000,000) to one hundred ninety-six million ($196,000,000) dollars. Gelman obtained information about the discounts paid by the funds for the purchase of restricted shares from the public disclosure of the issuing companies. In total, he analyzed eighty-nine (89) transactions. The median and mean discounts in the study were thirty-three percent (33%). We can infer from the study that not all discounts were thirty-three percent (33%). Twenty-seven (27) observations, or thirty percent (30%) of the sample, had discounts of less than twenty-five percent (25%). This contrasted thirty-two (32) observations, or thirty-six percent (36%) of the sample, that had discounts of forty percent (40%) or more. As Gelman observed in the article, about sixty percent (60%) of the transactions reflected discounts of thirty percent (30%) or more. He concluded his article with the following observation:

> "Depending on size and other factors, these actual discounts obtained by knowledgeable investors may serve as a guide to the valuation analyst in determining the discount to apply to the gross value previously determined for the closely held stock, in order to arrive at final value for the shares involved."

**Trout Study**
In a study of sixty (60) letter stock sales to mutual funds from 1968 to 1972, Trout found an average discount of thirty-three percent (33%) for restricted stock from the freely traded price. Like the SEC study, Trout also found that companies with stock listed on national exchanges had lower discounts on their restricted stock transactions than did OTC companies.

**Moroney Study**
Robert Moroney gave a speech to the Texas CPA Institute in December 31972 and his remarks were published in article form in *Taxes* in early 1973. The Moroney Study reviewed the Tax Court's treatment of liquidity discounts for closely held stocks in twelve (12) decisions from about 1960 through 1971. He then compared the discounts allowed in the cited cases with discounts required by ten (10) investment companies in their purchases of restricted stock of publicly traded companies. Moroney's central finding was that the Tax Court had embraced the concept of liquidity discounts, but had been reluctant to grant discounts commensurate with their economic reality in the market place. He also introduced a study of the purchases of restricted stock by ten (10) registered investment companies (1968-1972).

The Tax Court and many appraisers have given great credence to the thirty-five percent (35%) or so discount which is the approximate median/mean conclusion of the Moroney study. Consideration should be given to his measures of central tendency in the context of his entire analysis. In his discussion of cases, Moroney notes three (3) important issues for consideration regarding liquidity discounts.

a. There are no rules for establishing liquidity discounts. In the absence of guidance from the Internal Revenue Service, <u>expert</u> <u>witnesses</u> can be vital to explaining the use of liquidity discounts to the Tax Court.

b. While many publicly traded common stocks are purchased in the expectation of capital appreciation, <u>dividend</u> <u>yield</u> is a singularly important factor in the valuation of closely held stocks. Dividend yield provides current cash flow to the holder of a closely held stock and helps compensate for a potentially lengthy, indeterminable, and certainly uncertain holding period until some form of liquidity is achieved. Moroney is specific on this point:

> "The typical buyer of a minority interest in a closely held corporation has every right to insist on an adequate dividend yield because, his stock having no liquidity, he must be prepared

> to hold it for an indeterminable period of time, maybe years, and maybe decades, before some event will enable him to bail out, hopefully at a profit."

c. Moroney reacted to the suggestion of some Tax Court opinions that the other "inside" shareholders, particularly members of a control group, might automatically create a market for minority shares at premium prices, thereby mitigating any liquidity discount. Moroney's interesting discussion on this issue concludes as follows:

> In the deGuebriant case the court said: …"We recognize that stock in such closed corporation is hard to sell, there being no other market than that afforded by the few other stockholders."

Moroney provided an analysis of twenty-nine (29) court cases involving the concept of liquidity discounts. In 1972, he observed that twenty (20) of the twenty-nine (29) cases explicitly upheld the concept of liquidity discounts, and that the remainder implicitly employed a discount related to the lack of liquidity. In assessing the cases, Moroney discussed results of the SEC Study, which validated the use of higher discounts than found in the cases.

Moroney commented on the disparity between sales of restricted stock of publicly traded companies with the results of court decisions related to liquidity discounts for non-marketable interests of closely held companies. Astonishing to many people is the discovery that those discounts were as deep as fifty percent (50%), fifty-two percent (52%), fifty-seven percent (57%), sixty-two percent (62%), sixty-six percent (66%), eighty-one percent (81%), eighty-seven percent (87%) and even ninety percent (90%).

About forty-five percent (45%) of the discounts in the Moroney study are under thirty percent (30%). Reciprocally, some fifty-five percent (55%) of the discounts were thirty percent (30%) or greater. The mean discount in the study was thirty-five and six-tenths percent (35.6%), and the median was thirty-five percent (35%). The standard deviation is approximately eighteen percent (18%), which indicates a fairly wide dispersion about the mean.

**Maher Study**
J. Michael Maher studied the SEC filings of four (4) mutual funds to examine the discounts they required on purchases of restricted securities from 1969 to 1973. The recession years of 1974 -1975 were omitted because of the scarcity of transactions.

Of the thirty-three (33) restricted stock transactions, just over a third reflected a discount of thirty percent (30%) or less. Reciprocally, some two-thirds of the transactions were conducted at discounts of thirty percent (30%) or more from the freely traded prices of the underlying public securities.

**Standard Research Consultants Study**
In 1983, Standard Research Consultants (SRC) analyzed sales of letter stock to test the current applicability of the SEC study. SRC studied twenty-eight (28) private placements of restricted common stock from October 1978 through June 1982. Discounts ranged from seven percent (7%) to ninety-one percent (91%) with a median of forty-five percent (45%).

**FMV Opinions Study**
A study by FMV Opinions, Inc. ("FMV") is based on two hundred forty-three (243) restricted stock transactions from July 1980 through February 1997. The FMV study found an average discount of twenty-two percent (22%) and a median discount of twenty percent (20%).

**Management Planning Study**
This is one of the most current guideline data and it is presented in Z. Christopher Mercer's (Mercer) book, *Quantifying Liquidity Discounts*, by the author. Management Planning, Inc. (MP) is the company that conducted this private restricted stock study and named it the *Analysis of Restricted Stocks of Public Companies: 1980-1995*.

Mercer states that this study "represents a significant contribution, not only to this book, but to the appraisal profession." This is an accurate statement because, (1) this study is the most recently one published, (2) this study provides transactional data for each public company analyzed and
(3) This study contains a well-documented screening process to ensure that the companies studied provide consistent statistics.

MP searched for private placements of unregistered shares of common stock of companies that had approximately identical securities being traded in the marketplace. They consulted *Private Equity Week,* and *Investment Dealers' Digest and Private Placement Letter*, in order to ensure that their specific criteria were met.

Companies selected had to first meet the following:

- The company selling stock in a private placement must have common stock, which is equal in all other respects except liquidity to the registered stock that is publicly held and actively traded.
- Sufficient data on the private transaction must be readily available to enable analysis.
- The publicly traded common stock counterpart must be selling at a price of at least two dollars ($2.00) per share.
- The company must be a domestic corporation.
- The company must not have been characterized in public disclosure documents as being in a "developmental" stage.
- Eliminated companies whose unrestricted stocks were inactively traded, because of small, insufficient investor interest.

MP's initial research, using the above parameters, exhibited more than two hundred (200) private transactions. In nearly all of the transactions the private sale price was below the freely traded price. They observed restricted stock discounts ranging from one percent (1%) to eighty-six percent (86%).

MP then decided to further screen the above transactions in order to gain more "meaningful comparisons between various independent variables and the size of the discounts". They accomplished this by eliminating the following:

- Any company that suffered a loss in the fiscal year preceding the private transaction.
- Any company defined as a "start-up" company (defined as having revenues of less than three million dollars ($3,000,000)).
- Any transactions that were known to have registration rights.

These additional screens reduced the sample to forty-nine (49) transactional companies. Of these private transactions, one (1) took place at a price equal to the market price. The remaining transactions occurred at discounts ranging from approximately three percent (3%) to fifty-eight percent (58%). The average (mean) discount is twenty-seven and seven tenths percent (27.7%), and the median discount is twenty-eight and eight tenths percent (28.8%). The standard deviation of the discounts is fourteen and one tenth percent (14.1%), indicating that almost two-thirds of the discounts are in the range of fourteen percent (14%) to forty-two percent (42%).

**Willamette Management Associates Study**
Over the past several years, Willamette Associates, under the direction of Shannon Pratt, DBA, has conducted a series of thirteen (13) studies comparing private stock transactions to subsequent public offerings of stock in the same companies. Their studies cover the periods from 1975 to 1997. The average discount is 42% and the median discount is 52% while covering 1,007 transactions.

**Silber Study**
In a 1991 article, William L. Silber presented the results of analysis of sixty-nine (69) private placements of common stock of publicly traded companies between 1981 and 1988. He found that the average discount was thirty-four percent (34%), which is quite consistent with earlier studies. He also found that the size of the discount tended to be higher for private placements that were larger as a percentage of the shares outstanding. He found a small effect on the discount on the basis of the size of the company as measured by revenues. Tripling the revenues from $40 million, the mean of his sample, to $120 million increases the relative price of the restricted shares by only two and nine tenths (2.9) points.

**Johnson Study**
Bruce Johnson studied seventy-two (72) private placement transactions that occurred between January 1991 and December 1995. This was a significant study that reviewed transactions during the first five-year period after the Rule 144 restrictions were relaxed whereby the stocks examined in this study were only restricted for up to two (2) years. The overall average discount was twenty percent (20%), range was minus ten percent (-10%) to sixty percent (60%) and the standard deviation was sixteen percent (16%).

**Columbia Financial Advisors**
Columbia Financial Advisors divided their study into two (2) parts: (1) January 1, 1996 through April 30, 1997 to reflect a period before the Rule 144 holding period change to one (1) year and (2) May 1, 1997 through December 31, 1998 to reflect a period after the Rule 144 holding period was changed to one (1) year. They identified twenty-three (23) transactions in the first study and fifteen (15) transactions in the second study.

This study illustrated that the lack of liquidity discounts were generally lower. In the first study the average discount was approximately 21%, the range of discounts was 0.8% to 67.5% and the median was 14%. In the second study the average discount was 13%, the range of discounts was 0% to 30% and the median was 9%.

Since Rule 144 reduced the holding period of restricted stocks to match the holding period of long-term capital gains, this study clearly demonstrates the market's recognition of the increased liquidity of restricted securities.

**PRE-IPO Studies**

**Emory Study**
One of most widely used studies to quantify Liquidity Discounts is conducted periodically by John D. Emory, a senior member of the American Society of Appraisers and President of Emory Business Valuation, LLC, which he founded after thirty-one years at Robert W. Baird & Company, Inc. of Milwaukee, Wisconsin.

Emory's studies observe private placement transactions up to five (5) months prior to the Initial Public Offering ("IPO"). Because of the short time frame no adjustments are made. The average discount for the entire time period is forty-seven percent (47%).

Emory determined that private sales and transactions took place at a forty-eight percent (48%) median discount from the price at which the stock subsequently came to market.

Emory concluded the article with this observation:

> "The final question to be answered is that if these kinds of discounts are appropriate for promising situations where liquidity is probable, but not a certainty, how much greater should discounts be for the more typical company's stock that has no liquidity, little if any chance of ever becoming marketable, and is in a neutral to uncompromising situation?"

In an earlier report on his 1985-1986 study, Emory added this comment:

> "It is apparent that the lack of liquidity is one of the more important aspects of value, and the marketplace itself emphasizes this point. The size of discount for lack of liquidity depends on the individual situation and the likelihood of future liquidity."

**Summary of Studies on Restricted Stock Transactions**
The independent studies of restricted stock sales summarized above cover several hundred transactions from the middle 1960s through 1998. Considering the number of independent researchers and the very long time span encompassing a wide variety of market conditions, the results are quite consistent.

I represent/certify that, to the best of our knowledge and belief:

1. The statements of fact contained in this report, upon which analyses, conclusions and opinions expressed herein are based, are true and correct. However, we have relied, without independent verification, on the accuracy, completeness and fairness of all financial and other information that were publicly available or furnished to us by the management of the subject business and their accountants and legal counsel.

2. The reported analyses, opinion and conclusion of value is limited only by the reported assumptions and limiting conditions, and are our personal, impartial, independent, unbiased, objective professional, opinions and conclusions.

3. We have no present or prospective/contemplated financial or other interest in the business or property that is the subject of this report, and we have no personal financial or other interest or bias with respect to the property or the parties involved.

4. My engagement in this assignment was not contingent upon developing or reporting predetermined results.

5. My compensation for completing this assignment is fee-based and is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the outcome of the report, the amount of the opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this report.

6. The economic and industry data included in the report have been obtained from various printed or electronic reference sources that the valuation analyst believes to be reliable. The valuation analyst has not performed any corroborating procedures to substantiate that data.

7. My report was developed in conformity with the 2019 American Institute of Certified Public Accountants Statement on Standards for Valuation Services No. 1.

8. The parties for which the information and use of the report is restricted are identified; the report is not intended to be and should not be used by anyone other than such parties.

9. The valuation analyst has no obligation to update the report for information that comes to our attention after the date of the report.

10. This report was prepared under the direction of Andrew J. Runge, CPA/ABV, CFF, CVA, CFE, MBA. Mr. Runge is a Certified Public Accountant licensed in the State of Maryland and is accredited in business valuation and certified in financial forensics by the American Institute of Certified Public Accountants. In addition, Mr. Runge has earned the designation Certified Valuation Analyst by the National Association of Certified Valuation Analysts and the Certified Fraud Examiner credential from the National Association of Fraud Examiners.

*Circle Forensic Consulting, LLC*

## APPENDIX D – QUALIFICATIONS OF VALUATOR

Circle Forensic Consulting, LLC provides business valuation and litigation support and financial management consulting services for closely-held companies and their owners. The firm has an office in the Baltimore, Maryland area, serving clients along the East Coast.

The Members of Circle Forensic Consulting, LLC have provided several hundred valuation opinions for clients throughout the United States. Our clients have included law firms, medical practices, insurance companies, closely-held companies representing a broad spectrum of industries, publicly traded companies and individuals. Opinions have been rendered for a wide variety of purposes and have been used to facilitate many private and public transactions. Circle Forensic Consulting, LLC professionals have appeared as expert witnesses in courts and in other legal proceedings.

The CV of Andrew J. Runge follows this page.

Circle Forensic Consulting, LLC
Where the Beginning Meets the End.

# Andrew J. Runge, CPA/ABV, CFF, CFE, CVA, MBA
## Director of Forensic Accounting and Valuation Services

**PROFESSIONAL EXPERIENCE**

- Director of Forensic Accounting, Business Valuation and Litigation Services
  Circle Forensic Consulting, LLC
  2009-Present

- Director of Forensic and Valuation Services
  Rosen, Sapperstein & Friedlander, LLC
  January 2016-2025

- Member
  Spectrum Resolution Services, LLC/Stewart & Runge, LLC
  August 2010-December 2018

- Director
  Crawford GTS
  October 2013-April 2014

- Director of Forensic Accounting, Business Valuation and Litigation Services
  Naden/Lean, LLC
  2006-2009

- Senior Manager, Valuation & Forensic Services – Mid Atlantic Client Service Center
  Clifton Gunderson, LLP
  2005-2006

- Director of Forensic & Insurance Services
  McLean, Koehler, Sparks & Hammond
  2002-2005

- Manager, Forensic Services
  Gross Mendelsohn & Associates
  1996-2002

- Manager, Forensic Accounting
  Campos & Stratis
  1989-1996

**PRESENTATIONS AND ARTICLES**

- Howard County Bar Association, *Valuations in Operating Agreements*, September 2023
- National Association of Certified Valuation Analysts, *Valuations for Transfer Pricing Engagements*, November 2020
- National Association of Certified Valuation Analysts, *Wealth Planning During Tumultuous Times*, July 2020
- Towson University Accounting Society, Forensic Accounting Introduction, April 2019
- Guest Lecture: University of Baltimore Merrick School of Business, *How to Protect Yourself and Your Business from Fraud*, March 2017
- Maryland Construction Network, *How to Protect Your Business from Fraud*, December 2016
- Rosen, Sapperstein & Friedlander, LLC, *Introduction to Business Valuation, Fraud and Forensic Accounting*, August, September and October 2016
- The Daily Record, *How to Protect Against Corporate Fraud*, August 2016
- Maryland Association of Certified Public Accountants, *Forensic Accounting Issues*, May and November 2009
- Pennsylvania Chapter of ACFE, *Issues in Insurance Fraud*, May 2009
- Howard County Bar Association, *So you want to know about Fraud*, March 2009
- Maryland Defense Counsel, *Issues in Electronic Evidence*, September 2007
- Lorman Education Services, *Business Valuations*, August 28, 2007
- Maryland Association of Certified Public Accountants, *Selling Your Personal Financial Planning Business*, June 2005
- Maryland Association of Certified Public Accountants, *Forensic Accounting Issues*, May, July and September 2005, September 2006 and May 2007
- Guest Lecture: Villa Julie Forensic Studies Graduate Program, *Forensic Accounting in the Real World*, 2004
- Worldwide Partners Annual Meeting, *Evaluating Commercial Insurance and Risk*, May 2004
- Howard County Neo-Tech Incubator, *Preliminary Understanding of Business Valuation Methodology and Terminology*, 2003
- Travelers Insurance Company, *Calculating Business Income Losses and Extra Expenses*
- CNA Insurance Company, *Calculating Extra Expenses and Recognizing Signs of Fraudulent Documents*
- PMA Insurance, *Calculating Small Business Income Losses*
- Legal Times, *Accounting Missteps*, October 1995

**DEPOSITIONS AND TESTIMONY (Last 6 years through June 30, 2026)**

- Circuit Court for Baltimore City, Maryland, *Christopher O. Collins Architect, LLC v Meadow Development Group, Inc. Deposition Testimony, February 2025*
- Circuit Court for Baltimore County, Maryland, *Ace Logistics Services, Inc. v,\.. Pack-It, LLC* Deposition Testimony August 2024, Trial Testimony December 2024
- Circuit Court for Montgomery County, Maryland, *Triandafilou Investment Group, LLC vs. Ehigie, Andrew Asuelimen, et al* Deposition Testimony May 2024
- Circuit Court for Baltimore City, *Sophie Fernando, LLC et al v Daniel Midvidy, et al*, Deposition Testimony November 2023
- Circuit Court for Baltimore County, *Pettyjohn et al v. Rains*, Trial Testimony August 2023
- Circuit Court for Baltimore City, *Auchentoroly Estates, LLC v. Adam Carballo et al.*, Deposition Testimony, February 2023, Trial Testimony May 2023
- Circuit Court for Harford County, *Frontier Bel Air, LLC v Next Day Blinds Corporation et al.*, Deposition Testimony February 2023
- Circuit Court for Baltimore County, *Murphy et al v. Harbach et al* Deposition Testimony, January 2021
- United State Bankruptcy Court for District of Maryland, *Creditor Objection to Third Amended plan filed by Byung Mook Cho*, Hearing Testimony, May 2019
- Circuit Court for Baltimore City, *Horjus v. Horjus,* Trial Testimony, April 2019
- Circuit Court for Baltimore City, *Rohleder v. Breeback*, Deposition Testimony, March 2019
- Circuit Court for Frederick County, *Gorman v. Gorman*, Deposition Testimony, October 2018
- American Arbitration Association, *SSG Baltimore, LLC and Brooklyn Joe GST Irrevocable Trust U/A/D January 20, 2015 v. Emil F. Gerardi and Noble 8, LLC*, Arbitration Testimony, September 2018
- Circuit Court for Baltimore County, *United States Surety Company, et al. v. Sens Mechanical, Inc., et al.*, Deposition Testimony, August 2018

**DEPOSITIONS AND TESTIMONY (Continued)**

- Circuit Court for Howard County, *James K. Skipper III v. John F. Skipper, NCSI, Inc. et al*, Deposition Testimony, July 2017, Trial Testimony November 2017
- Circuit Court for Talbot County, *Drayton v. Seger et al*, Trial Testimony, May 2017
- American Arbitration Association, *Ressa Construction, Inc. v. Eric Pogue*, Deposition and Arbitration Testimony, April 2017
- Circuit Court for Prince Georges County, *Exlnt Solutions, Inc. et al v Birch Advisors, LLC*, Deposition Testimony, January 2017
- Circuit Court for Prince Georges County, *Neal v. Neal*, Trial Testimony, September 2016
- United States Bankruptcy Court for the District of Columbia, *Stuart Mills Davenport Debtor Objection to Proof of Claim filed by Babak Djourabchi et al*, Trial Testimony, May 2016 and February 2018
- Circuit Court for Howard County, *Arirang Adult Daycare, Ltd et al v. Kim*, Deposition Testimony, December 2015
- Circuit Court for Charles County, Maryland, *Turbo Haul v. AB Construction et al*, Trial Testimony, September 2014
- Circuit Court for Carroll County, Maryland, *1st Team Fitness v. Illiano et al*, Deposition Testimony, August 2014, Trial Testimony, July and October 2014 and April 2016
- Maryland Department of Insurance Administrative Hearing, Baltimore County, Maryland, *Kortagere v. Encompass Insurance*, Trial Testimony, April 2014
- Circuit Court for Baltimore County, Maryland, *Dell v. Dell*, Deposition and Trial Testimony, March 2013
- Circuit Court for Prince Georges County, Maryland, *Tennyson v. Tennyson*, Trial Testimony, January 2013
- Circuit Court for Montgomery County, Maryland, *Fries v. Zierdt et al*, Trial Testimony, December 2012
- Court of Common Pleas, York County, Pennsylvania, *Commonwealth of Pennsylvania v. Steven Gebhart*, Trial Testimony, November 2011
- United States Court of Federal Claims, *Seraphim Transport Company v. United States,* Deposition Testimony, October 2011
- Circuit Court for Baltimore County, *Benelogic LLC v. Dellavecchia et al*, Trial Testimony, January 2011
- Circuit Court for Howard County, Maryland, *Wankerl v. Wankerl*, Deposition Testimony, September 2010, Trial Testimony, November 2010
- Circuit Court for Baltimore County, Maryland, *Prevas v. Neumann*, Trial Testimony, September 2010
- Circuit Court for Baltimore County, Maryland, *Devou v. Devou*, Trial Testimony, November 2009
- Circuit Court for Harford County, Maryland, *MBC v. Katolight*, Deposition Testimony, July 2009
- Circuit Court for Baltimore County, Maryland, *Hamamoto v. Luskin*, Trial Testimony, June 2009
- American Arbitration Association Construction Industry Arbitration Tribunal, *Kajima Construction Services v. Harrison Inn Stardust, Inc*., Arbitration Testimony, April 2008
- Circuit Court for Howard County, Maryland, *Authsec, Inc. v. LS3, et al*, Deposition Testimony, April 2008, Trial Testimony, July 2009
- Circuit Court for Baltimore County, Maryland, *Stellar Investments v. PRIS-MM, LLC*, Trial Testimony, November 2007
- American Arbitration Association Commercial Tribunal, *Leiter's Fine Catering v. IDEARC Media Corporation,* Arbitration Testimony – August 2007
- Circuit Court for Harford County, Maryland Deposition Testimony, *NetVersant v. Kenneth Michael Simmons,* September 2006 – Arbitration Testimony – March 2007
- United States District Court, Deposition Testimony, *Gary Womer v. Koenig, et al,* November 2006
- United States District Court, *American Home Medical, Inc., et al v. Masterline, Inc., et al*, Deposition Testimony, June 2006
- Circuit Court for Baltimore County, Maryland, *Perkins v. Dill,* Trial Testimony, July 2005
- Circuit Court for Anne Arundel County, Maryland, *Parisi's Diamond Trust v. Great American Insurance Company,* Trial Testimony, July 2005
- Circuit Court for Howard County, Maryland, *Patuxent Technology Partners, LLC v. Frank Davis, et al*, Deposition Testimony, 2004

## PROFESSIONAL AND VOLUNTEER MEMBERSHIPS

- American Institute of Certified Public Accountants
- Maryland Association of Certified Public Accountants
- National Association of Certified Valuation Analysts
- Association of Certified Fraud Examiners

## ACADEMIC PREPARATION

- Passed Uniform Certified Public Accountant Exam – 1992

- The Peter Drucker School of Management at the Claremont Graduate School
  Master of Business Administration – 1989

- Whittier College
  Bachelor of Arts, Business Administration – 1988

## SUMMARY OF EXPERIENCE

Andrew Runge has over 30 years of experience in forensic accounting/investigation, asset tracing, money laundering, economic damages, insurance services and business valuations. He has been deposed more than 50 times and testified in court or other judicial proceedings more than 40 times. He has consulted on hundreds of economic damage, construction delay, lost income, bodily injury, wrongful death, employee dishonesty, construction and other insurance claims exceeding hundreds of millions of dollars in the United States and abroad. Mr. Runge has prepared or evaluated thousands of business interruption and other claims on behalf of policy holders/claimants or insurance carriers/defendants including evaluating claims presented to the Gulf Coast Claims Facility, the independent fund set up by BP subsequent to the Deep Water Horizon Oil Spill in the Gulf of Mexico and administered by Kenneth Feinberg, Esq. He has been involved in more than 100 assignments related to asset tracing, money laundering or other alleged employee defalcations or investigations of financial irregularities in Healthcare, Casino & Hospitality, Financial Services and other industries. Mr. Runge has prepared numerous business valuations of privately held companies as a whole and as partial interests. He has also provided forensic accounting, fraud investigation and litigation support services including assistance in case analysis, preparation for trial and expert witness testimony. He has experience with insurance, healthcare, governmental entities, government contracting, construction, banking and finance, legal and accounting, manufacturing, electrical, computer, biotechnology, technology, medical and dental, casino and gaming, hotel and hospitality, farming and animal husbandry, retail, mining and other industries.